## NORTHWESTERN MUT. FIRE ASS'N v. UNION MUT. FIRE INS. CO. OF PROVIDENCE, R. I.

No. 10584.

Circuit Court of Appeals, Ninth Circuit.

Aug. 4, 1944.

Corwin S. Shank, Jo D. Cook, H. C. Belt, and Shank, Belt, Rode & Cook, all of Seattle, Wash., for appellant.

Bogle, Bogle & Gates, Lawrence Bogle, Cassius E. Gates, and Ray Dumett, all of Seattle, Wash. (Duncan & Mont, of New York City, of counsel), for appellee.

Before MATHEWS, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

This case involves a dispute concerning the interpretation of a contract of reinsurance.

The contract, termed in the insurance world a "treaty," was entered into between the parties in January 1940. Appellant was the reinsured company and appellee the reinsuring company. In the first article of the treaty appellant agreed to cede reinsurance to appellee, and the latter agreed to accept such reinsurance, on account of liability arising under policies written by appellant on property located anywhere in the United States or the Dominion of Canada. Reinsurance was to be ceded on the "daily report and account current plan," liability to be made effective by the specific written designation of the reinsuring company by the reinsured company.[1] A vital article (referred to as the "net retention clause") provided that cessions of reinsurance "shall in no case and at no time exceed the amount retained net without reinsurance by the reinsured company at its own risk and liability on the same property." A succeeding article provided that if in case of loss it should appear that the amount ceded to the reinsuring company was in excess of the amount authorized in the net retention clause, then the amount was to be reduced so that the liability of the reinsuring company would not be greater than it would have been had the clause been complied with.

During the year 1940 the Washington Toll Bridge Authority constructed a single-span suspension bridge across Puget Sound at the Tacoma Narrows. Appellant wrote $350,000 of insurance on this bridge, insuring the Authority against loss or damage by various risks, including windstorm and collapse, upon the bridge and approaches. Of this amount appellant specifically reinsured $300,000 with various companies, including appellee. On June 10, 1940 appellant wired appellee, in confirmation of a letter written ten days earlier, stating among other things: "Further information just received indicates P.M.L. [probable maximum loss] about 50%.[2] We will retain $50,000. Please wire your authorization." Next day appellee wired appellant authorizing the cession of $50,000 of reinsurance under the treaty, and simultaneously confirmed its wire by letter. About the same time appellant transmitted to appellee its daily report stating that, pursuant to the treaty, it had placed reinsurance with appellee on the Tacoma Narrows Bridge, effective July 1, 1940, in the sum of $50,000. The report stated that appellant was retaining "identical $50,000 * * * in accordance with your authorization."

In November 1940 the bridge collapsed. Of the whole amount of insurance carried thereon by the Toll Bridge Authority approximately 77% was paid by the various insurers in full settlement of the loss. Appellant advised appellee that the net loss sustained by the former, after deducting all reinsurance, was $38,416.54 "prior to excess." In response to appellee's inquiry as to the meaning of the phrase "prior to excess," appellant explained that it had in effect a "catastrophe excess reinsurance contract" with Lloyds whereby it was reinsured to the extent of 90% of all loss in excess of $30,000 in any one catastrophe. No consideration, it said, had been given to this catastrophe excess reinsurance in figuring net retention because of the indicated probable maximum loss of 50%. Appellee thereupon took the position that appellant had really retained net only $32,000 (that is to say, $30,000 plus 10% of $20,000) and that in consequence appellee's liability under the treaty was subject to a corresponding adjustment. Appellant sued for the full sum

[1] The treaty limited the amount of reinsurance on any one risk to $25,000 unless specific authority was obtained for ceding a greater sum.

[2] In the insurance field the phrase "probable maximum loss" appears to indicate the opinion of the insurer concerning the greatest loss the various insurers will have to pay in the event of any catastrophe likely to occur.

claimed. In its answer appellee admitted liability for 77% of $32,000 but contested the balance.[3]

Upon the trial appellant was permitted, over objection, to introduce parol evidence to the effect that in the reinsurance field the phrase "amount retained net without reinsurance" means the amount of liability on a given risk remaining with the primary company after the deduction of all "specific" reinsurance from the gross line relating to that particular risk; in other words, that general catastrophe excess insurance is not considered in arriving at the net retention figure. Appellee, in turn, produced expert witnesses who testified that the phrase has reference to the maximum amount which the ceding company would be called upon to pay out of its own pocket in the event of a total loss. In this instance, they observed, the maximum could not exceed $32,000. These witnesses described the insurance carried by appellant with Lloyds as "excess of loss insurance," which, they said, is merely a form of reinsurance.

The court found that the plain terms of the treaty are in accord with the position taken by the reinsuring company.[4] It found, moreover, that under the custom and usage of the business, as shown orally, the phrase "amount retained net" bears the meaning ascribed to it by appellee's experts. Further, that the contract with Lloyds, admittedly having application to a single risk such as the Tacoma Narrows bridge, constituted excess of loss reinsurance rather than catastrophe coverage. We discover no clear error in any of these findings.

Insurance authorities are agreed that a ceding company, which is on the ground, makes the investigation, and is in possession of all the details relating to the risk, is required to exercise the utmost good faith in all its dealings with the reinsurer.[5] Here, the treaty obliged the ceding company to retain a stake in the insurance in an amount not less than that ceded to the reinsurer. The requirement afforded a continuing guaranty of vigilance on the part of the reinsured company. Appellant knew that its liability on this risk could in no event exceed $32,000 however complete a catastrophe might overtake the bridge. One may assume that its estimate of probable maximum loss (an estimate which, if correct, would not bring into play its excess of loss insurance carried with Lloyds) reflected overoptimism on its part, and that there was no active bad faith in its failure to disclose the existence of this reinsurance. But the fact remains that the reinsurance existed and that the actual loss sustained proved to be closer to 100% than to the 50% estimated. Under the express terms of the treaty the liability of the reinsuring company was subject to the adjustment claimed.

Appellant insists that appellee was aware of the existence of the reinsurance in question, but the record does not bear out the claim. Certainly there is no showing that appellee was presently familiar with the details of the excess coverage.

Affirmed.

---

[3] The admitted amount was tendered, and the tender was accepted by appellant without prejudice.

[4] The court's opinion and findings are reported in 50 F.Supp. 785.

[5] Consult H. Ernest Seer, "Approach to Reinsurance," p. 31; C. E. Golding "The Law and Practice of Reinsurance," Buckley Press Ltd., 1937, pp. 13–15; John H. Magee "General Insurance," 1939, p. 100; Thompson on Reinsurance, Commerce Clearing House, Inc., 1942, p. 113; Columbian National Fire Insurance Co. v. Pittsburgh Fire Insurance Co., 236 Mich. 243, 210 N.W. 258, 259.