**STONEWALL INSURANCE COMPANY, an Alabama Corporation, Plaintiff,**

v.

**ARGONAUT INSURANCE COMPANY, a California Corporation, Defendant.**

**Argonaut Insurance Company, Counter–Plaintiff,**

v.

**Stonewall Insurance Company, Counter–Defendant.**

**No. 96 C 3261.**

United States District Court, N.D. Illinois, Eastern Division.

Dec. 3, 1999.

Kathy Pinkstaff Fox, Kristin M. Buchholz, Wildman, Harrold, Allen & Dixon, Chicago, IL, Robert L. Kiesler, John J. Piegore, Kiesler & Berman, Chicago, IL, Deborah F Cohen, Aaron Krauss, Donna Elizabeth Correll, Christine L Schubert, Charles E. Leasure, III, Pepper, Hamilton & Scheetz, Philadelphia, PA, Jacqueline M Satherlie, Kiesler & Berman, Chicago, IL, James Thomas Nyeste, Attorney at Law, Glencoe, IL, for Stonewall Insurance Company.

Katherine Smith Dedrick, Kevin J. Kuhn, Kent J. Cummings, Hinshaw & Culbertson, Chicago, IL, for Argonaut Insurance Company.

## OPINION and ORDER

NORGLE, District Judge.

Before the court are (1) Stonewall Insurance Company's Objections to the Magistrate Court's Report recommending that its motion for summary judgment be "stricken" as moot; and (2) Argonaut Insurance Company's Motion for Entry of Judgment. For the following reasons, the court (1) sustains Stonewall's Objections, but denies its motion for summary judgment; and (2) grants in part and denies in part Argonaut's Motion for Entry of Judgment.

## I. BACKGROUND

This diversity action involves the business of reinsurance and California law.

"Reinsurance occurs when one insurer (the 'ceding insurer' or 'reinsured') 'cedes' all or part of the risk it underwrites, pursuant to a policy or group of policies, to another insurer." *Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.*, 4 F.3d 1049, 1053 (2nd Cir.1993); *see also Continental Cas. Co. v. Stronghold Ins. Co., Ltd.*, 77 F.3d 16, 17 (2nd Cir.1996); *Prudential Reins. Co. v. Superior Ct.*, 3 Cal.4th 1118, 14 Cal.Rptr.2d 749, 753, 842 P.2d 48 (1992); *In re Mission Ins. Co.*, 41 Cal.App.4th 828, 48 Cal.Rptr.2d 209, 211 (1995); *Excess and Cas. Reins. Assoc. v. Calif. Ins. Comm.*, 656 F.2d 491, 492 (9th Cir.1981); Cal.Ins. Code § 620. Put another way, "[r]einsurance is purchased by insurance companies to insure their liability under policies written to their insureds." *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1199 (3rd Cir.1995).

"The reinsurance relationship depends on the reinsurer and the reinsured observing high levels of good faith[,]" *id.*, and thus their relationship is "often characterized as one of 'utmost good faith.'" *Unigard*, 4 F.3d at 1054; *see also Northwestern Mut. Fire Ass'n. v. Union Mut. Fire Ins. Co.*, 144 F.2d 274, 276 (9th Cir. 1944). For example, under a "follow the fortunes" clause typically found in a reinsurance contract, "[a] reinsurer cannot second guess the good faith liability determinations made by its reinsured...." *Christiania Gen. Ins. Corp. v. Great American Ins. Co.*, 979 F.2d 268, 280 (2nd Cir.1992). At the same time, however, the reinsurer has the right to question whether the ceding insurer's claims stem from reinsured losses, and therefore the reinsurer must have the cooperation of the ceding insurer. *See Unigard*, 4 F.3d at 1054, 1069; *CIGNA*, 52 F.3d at 1199–1200; *cf.* Cal.Ins.Code § 622.[1] It is this proposition that has spawned this messy, protracted litigation between a reinsurer, Stonewall Insurance Company, and a ced-

---

1. For excellent overviews of the reinsurance business, see *CIGNA*, 52 F.3d at 1199–1206; *Unigard*, 4 F.3d at 1053–54; and Steven W. Thomas, *Utmost Good Faith in Reinsurance: A Tradition in Need of Adjustment*, 41 Duke L.J. 1548 (June 1992).

ing insurer, Argonaut Insurance Company. A summary follows.

Pursuant to a reinsurance contract, Argonaut sought indemnification (*i.e.,* reimbursement) from Stonewall after Argonaut agreed to settle a complex environmental pollution insurance coverage dispute with its original insured, Hughes Aircraft Company.

Hughes had filed separate lawsuits against Argonaut and several other primary insurers in the Superior Court of the State of California, seeking coverage for environmental pollution that its manufacturing plant had leaked into the City of Fullerton's sanitary sewer system and alleging bad faith for wrongful refusal to defend in litigation stemming from past contamination at its plant property. In that underlying pollution litigation, Hughes was left to provide its own defense, and ultimately settled the claims against it. Hughes' insurers, which, in addition to Argonaut, included Hartford Accident and Indemnity Company, Insurance Company of North America, and various syndicates of Lloyd's of London,[2] had issued primary insurance policies to Hughes at various times over the last several decades.

Argonaut had issued Hughes two primary insurance policies during this time period. One policy covered the period January 1, 1970 to January 1, 1971, and did not contain a pollution exclusion. This policy was reinsured by various syndicates of Lloyds of London and included a unique provision that gave Lloyds full and complete control of any claim asserted under the primary policy. The other Argonaut policy, most relevant here, covered Hughes for the period January 1, 1972 through April 1, 1975 for $1 million per occurrence, and contained a pollution exclusion, which excluded pollution coverage unless the pollution was "sudden and accidental." (See Compl., Ex. A.) This policy was reinsured by Stonewall via three facultative certificates of insurance.[3] (*See* Compl., Exs. B, C, and D.)

The first of the *Hughes* primary coverage cases to go to trial was *Hughes Aircraft Co. v. Brian E. Beagley.*[4] On November 14, 1995, a California jury found in favor of Hughes and against Beagley in a special verdict on liability. Specifically, the jury found four different occurrences or sources of environmental contamination (two in 1960 and two in 1961) at Hughes' Fullerton plant, thereby triggering Beagley's coverage. The jury also found that Beagley acted in bad faith for its wrongful refusal to defend Hughes.

Before the damages portion of the trial began, however, Hughes and Beagley reached a settlement and the case was dismissed, without the entry of a final judgment. Although Argonaut did not directly participate in the *Beagley* litigation,

**2.** Lloyds of London is an unincorporated association whose member "names," or underwriters, join syndicates which in turn join together to underwrite various risks. *Indiana Gas Co. v. Home Ins. Co.,* 141 F.3d 314, 316 (7th Cir.), *cert. denied sub nom. Certain Underwriters at Lloyd's, London v. Indiana Gas Co.,* —— U.S. ——, 119 S.Ct. 339, 142 L.Ed.2d 280 (1998).

**3.** There are two basic types of policies issued in the reinsurance business: facultative and treaty. As the *Unigard* court explained,

In facultative insurance, a ceding insurer provides reinsurance for·a part, or all, of a single insurance policy. Treaty reinsurance covers specified classes of a ceding insurer's policies. [A] typical treaty reinsurance agreement might reinsure losses incurred on all policies issued by the ceding insurer to a particular insured, while facultative reinsurance would be limited to the insured's losses under a policy or policies specifically identified in the reinsurance agreement.

4 F.3d at 1054 (citation and internal quotation marks omitted); *see also* Thomas, *supra,* at 1550–51.

**4.** Beagley was associated with Lloyd's of London and issued Hughes primary insurance in the years prior to 1965. Apparently, Beagley was not one of the specific syndicates that provided reinsurance to Argonaut under the 1970–71 primary insurance policy issued to Hughes. Stonewall asserts that Argonaut later failed to advise it that Stonewall's financial interests were in conflict with Argonaut's reinsurers from Lloyd's.

it had closely monitored the case because of the potential ramifications the litigation would have on Argonaut's ongoing coverage dispute with Hughes. Argonaut though later settled with Hughes ("the Fullerton Settlement") in early 1996; the Fullerton Settlement included a full site release and encompassed all of Argonaut's policies. Argonaut, in turn, sought indemnification under its reinsurance policy with Stonewall.[5]

Stonewall, however, balked at submitting the reinsurance monies to Argonaut. Stonewall questioned Argonaut's candidness about the details of the Fullerton settlement and was allegedly unable to discern or meaningfully review the information and mass of documents that Argonaut had submitted. Stonewall contended that Argonaut had violated a provision of the reinsurance contract which required that Argonaut cede its reinsurance claim based on its reasonable, legitimate settlement with the underlying insured—Hughes.[6] That is, Stonewall asserted that Argonaut settled with Hughes on the basis of multiple pollution occurrences at the Fullerton plant, a la *Beagley*, but then turned around and ceded its reinsurance claim to Stonewall on the basis of one occurrence. Stonewall also maintained that Argonaut mishandled and manipulated its *Hughes* litigation and eventual settlement for several reasons: (1) to trigger Stonewall's "sudden and accidental" reinsurance obligation by sidestepping the policy's pollution exclusion for multiple occurrences; (2) to avoid a finding of bad faith and the resulting punitive damages that it would not be able to cede to Stonewall; (3) to avoid the expense of a costly defense to the Hughes coverage; and (4) to avoid full exposure from the 1970 policy. According to Stonewall,

> Argonaut's claimed settlement of a complex environmental pollution claim, purportedly on a 'one-occurrence' basis, is inconsistent with the existing facts and law governing its settlement at that time. The evidence of how and why Argonaut settled is overwhelming: Argonaut settled [with Hughes] on the basis of exposure to *six* occurrences for liability for substantial bad faith damages for Argonaut's wilful refusal to defend, knowingly in contradiction of law and contract. The reason Argonaut manipulated the settlement from the six occurrences and bad faith basis is because of the adverse financial consequences inherent in ceding to its reinsurers, including Stonewall, in accordance with the actual settlement.

(Pl.'s Trial Br. at 2.)[7]

On May 31, 1996, Stonewall filed the instant suit, seeking a declaratory judg-

---

**5.** For further background on the *Hughes* coverage litigation, see *Hughes Aircraft Co. v. Century Indemnity Co.*, 141 F.3d 1176 (Table), 1998 WL 166534 (9th Cir.1998); *Hughes Aircraft Co. v. Hartford Accident and Indemnity, Co.*, CV 92–6031, 1994 WL 269161, at *1 (C.D.Cal. March 28, 1994). *See also Smith v. Hughes Aircraft Co.*, 22 F.3d 1432 (9th Cir. 1993) (addressing underlying suits filed in Arizona against Hughes for similar contamination it had caused in Tucson).

**6.** The "follow the settlements" doctrine requires the reinsurer to cover the settlement made by the reinsured, as long as the settlement is reasonable, and the settlement is not fraudulent, collusive or made in bad faith. *See National Amer. Ins. Co. of Cal. v. Certain Underwriters, at Lloyd's London*, 93 F.3d 529, 535 (9th Cir.1996); *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir.1992); *Aetna Casualty & Sur. Co. v. Home Ins. Co.*, 882 F.Supp. 1328, 1346–47

(S.D.N.Y.1995). This doctrine is similar, if not identical, to the "follow the fortunes" doctrine. *See National Amer.*, 93 F.3d at 535 n. 15 (declining to resolve distinction); *CIGNA*, 52 F.3d at 1199, 1205 (noting that the follow the fortunes doctrine applies to settlements and judgments); *Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd.*, 9 F.Supp.2d 49, 66 (D.Mass.1998) (distinguishing between the two doctrines). The reinsurance policy that Stonewall issued to Argonaut also included "follow the forms" language, which "expressly limits the reinsurance to the terms and conditions of the underlying policy and provides that the reinsurance certificate will cover only the kinds of liability covered in the original policy issued to the insured." *CIGNA*, 52 F.3d at 1199.

**7.** The "six" occurrences that Stonewall refers to consist of the four that the *Beagley* jury found and two other alleged occurrences from acts of vandalism in the late 1960s.

ment that Argonaut must respond to inquiries about its claim for reinsurance monies stemming from the Fullerton Settlement. In its complaint, Stonewall accused Argonaut of breaching its duty of utmost good faith and asked the court to declare (1) that Stonewall was entitled to "all information necessary" to evaluate the propriety of the Fullerton Settlement and the basis for Argonaut's coverage and request for indemnification; and (2) that Stonewall was not obligated to reimburse Argonaut unless such information was given. In sum, Stonewall alleged that, although Argonaut had given it factual information regarding its demand for reimbursement, (1) that factual information was not presented in an orderly comprehensible fashion, (2) Argonaut had been evasive in answering Stonewall's questions, and (3) Argonaut had refused to explain to Stonewall why reimbursement was warranted under the reinsurance contract. One of Stonewall's requests was an explanation of how the Fullerton settlement amount was allocated among the multiple insurance years covered and the several co-reinsurers.

In February 1997, Argonaut filed a counterclaim alleging breach of contract, breach of duty of good faith, and breach of duty of utmost good faith under California law. Argonaut also asked for a judgment declaring that Stonewall owed it reimbursement for Stonewall's contractual portion of the Fullerton Settlement, and for defense fees and costs incurred by Hughes in its underlying pollution litigation. Argonaut alleged that Stonewall asked unreasonable questions about the Fullerton Settlement and that Stonewall feigned an inability to understand the facts and reasoning behind the Fullerton Settlement. For example, Argonaut alleged that Stonewall repeatedly contended that Argonaut should not have settled because of the existence of a pollution exclusion. Argo-

naut maintained, however, that Stonewall had settled other environmental cases despite the existence of a pollution exclusion because of its fear of litigation.

In October 1997, the court referred the case to Magistrate Judge Ashman to conduct all pretrial duties consistent with his constitutional and statutory authority. *See* 28 U.S.C. § 636; Fed.R.Civ.P. 72(b); N.D.Ill. Local Gen.R. 2.41(b). Numerous discovery disputes ensued, along with several objections to Magistrate Judge Ashman's rulings. On November 19, 1998, this court set a trial date of January 25, 1999. On December 3, 1998, each party cross-moved for summary judgment, and the motions became fully-briefed on January 8, 1999.

On January 25, 1999, the trial began before this court, as scheduled. The parties' respective motions for summary judgment, however, remained pending before the Magistrate Judge. After over three weeks of trial, the jury returned a verdict in favor of Argonaut and against Stonewall on February 16, 1999. The jury awarded Argonaut (1) $2,455,986.35 (plus prejudgment interest) on its breach of contract claim; (2) $6 million in punitive damages on its claim that Stonewall breached its duty of good faith; and (3) $7 million in punitive damages on its claim that Stonewall breached its duty of utmost good faith.[8] Additionally, the jury (1) found in favor of Argonaut on its declaratory judgment count, *i.e.*, the jury declared that Stonewall was obligated to reimburse Argonaut for Stonewall's contractual portion of the Fullerton Settlement and for defense fees and costs incurred by Hughes in its underlying pollution litigation; and (2) found against Stonewall on its declaratory judgment, *i.e.*, the jury declared that Stonewall received all information necessary to evaluate the propriety of the Fullerton Settlement and the basis of coverage

---

**8.** After the jury announced its verdict, Stonewall asked the court to ask the jury the following question: "Was it the jury's verdict to award punitive damages in the total amount of $13 million?" The question was reduced to written form and submitted to the jury. The jury then briefly deliberated and answered "YES" to the court's inquiry. (*See* Trial Tr. 2671–2673.)

for the primary insurance policy and the reinsurance certificate and that Stonewall was obligated to reimburse Argonaut for the Fullerton Settlement. Finally, the jury answered **"NO"** to the following five Special Interrogatories that Stonewall had tendered:

1) Do you find that because of the jury finding of four occurrences in Beagley and the two sudden and accidental spills, Argonaut settled with Hughes Aircraft based on exposure to six occurrences?
2) Do you find that Argonaut's settlement was based in part on Argonaut's exposure to bad faith liability for its failure to defend Hughes?
3) Do you find that Argonaut failed to provide Stonewall with all the information necessary for Stonewall to understand Argonaut's settlement with Hughes [the Fullerton Settlement] and/or the subsequent cession of that settlement to Stonewall?
4) Do you find that the questions asked by Stonewall pertaining to Argonaut's settlement were not in bad faith?
5) Do you find that any amount of the billings charged to Stonewall contain amounts charged for bad faith?

On February 18, 1999, Magistrate Judge Ashman issued a Report recommending that the parties' cross-motions for summary judgment "be stricken as moot." Also on February 18, 1999, Argonaut moved for entry of judgment on the jury's verdict. On March 4, 1999, Stonewall filed objections to Magistrate Judge Ashman's recommendation that its motion for summary judgment be stricken as moot. After extensive briefing, Argonaut's motion and Stonewall's objections are now ripe for disposition. The court turns first to Stonewall's objections to Magistrate Judge Ashman's recommendation to strike its motion for summary judgment as moot.

## II. DISCUSSION

*Whether the Trial Mooted Stonewall's Motion for Summary Judgment*

In its objections, Stonewall argues that because its motion for summary judgment

asserted the legally, as opposed to factually, dispositive issue of collateral estoppel, the Magistrate Court erred in deeming it moot. In other words, Stonewall contends that because its motion involved a purely legal question, the general rule that a trial moots a motion for summary judgment, *see Watson v. Amedco Steel, Inc.*, 29 F.3d 274, 277–78 (7th Cir.1994), does not apply. Stonewall argues a ruling on its motion was critical because, if granted, "the *Beagley* jury's finding of multiple occurrences would have collaterally estopped Argonaut from relitigating the number of occurrences had it tried its own coverage case and therefore, Argonaut could not possibly have settled on the basis of one occurrence." (Objs. at 2.) In short, Stonewall asks the court to reserve entering judgment on the jury's verdict until its assertion of collateral estoppel is addressed.

In response, Argonaut maintains that "Stonewall expressly submitted the collateral estoppel issue to the jury, instructing the jury at length as to all of its elements." (Resp. at 2.) Argonaut then excerpts those jury instructions in its response, which do indeed ask the jury to resolve the collateral estoppel issue:

The jury in *Beagley* found four different occurrences or sources of environmental contamination at the site in Fullerton, California under California law, resulting occurrences for which the insurer was obligated to indemnify Hughes. You need not reconsider the jury finding of multiple recurrence [sic] occurrences in the *Beagley* trial.

Stonewall also contends that the cessation of settlement was unreasonable because Argonaut considered that the effect of the *Beagley* verdict, about which you have just heard, would, in all probability, result in a verdict against Argonaut for multiple occurrences on the Fullerton claim.

Essentially, Stonewall claims that because the jury in *Beagley* found multiple occurrences for the same environmental claim over which Argonaut was litigat-

ing, Argonaut felt it could not relitigate the point based on the doctrine of collateral estoppel.

Stonewall bases its argument on a doctrine called collateral estoppel. The doctrine of collateral estoppel means that when an issue of ultimate fact has been previously determined by valid and final judgment, that issue cannot be relitigated between the same parties or parties closely related. A jury verdict is a final judgment.

The doctrine of collateral estoppel requires four elements: (1) the issue is identical to an issue in a prior action; (2) the issue was actually litigated in the prior action; (3) the issue was essential to the prior judgment; and (4) the party being precluded was represented in the prior action.

Because the *Beagley* case involved the same plaintiff and the identical issue of coverage, number of occurrences, on the same policy language in the same court as the suit against Argonaut and because it ended in a jury verdict, it is undisputed that the first two factors are satisfied.

&ast; &ast; &ast; &ast; &ast; &ast;

Under the third [sic] factor, privity refers to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is sufficiently close so as to justify applying collateral estoppel. Privity exists where the non-party has an identity of interest with and an adequate representation by the party in the first action, and the non-party should reasonably expect to be bound by the prior adjudication.

If you find that Argonaut's interests were essentially identical to those of the *Beagley* defendants, that there was an adequate defense in the *Beagley* litigation, or that Argonaut should have expected to be bound by the prior litigation, then you must find that Argonaut was bound by the ruling in *Beagley* to settle on the basis of multiple occurrences and a settlement and cession on

the basis of one occurrence was not reasonable.

In such a case, you must find in favor of Stonewall.

(Tr. Trans.2646–2648.) Thus, Argonaut argues that "[h]aving submitted the issue to the jury, and having the jury find against Stonewall, Stonewall cannot now submit the identical issue to another fact-finder for a second bite at the apple. Stonewall has waived, or itself estopped to claim, any right to summary judgment on the issue." (Resp. at 3.)

Furthermore, Argonaut notes that because the jury found in its favor on its clams of breach of duty of good faith and breach of duty of utmost good faith, it necessarily implies that Stonewall had no proper basis, such as collateral estoppel, for not paying reinsurance reimbursement. Put another way, Argonaut asserts that the jury's verdict "required [it] to reject all of Stonewall's defenses, including the argument that Argonaut was collaterally estopped to claim one occurrence or to deny that there were six occurrences." (Resp. at 4.) Finally, Argonaut argues that in any event, Stonewall's assertion of collateral estoppel is baseless because (1) the *Beagley* verdict was not a final judgment triggering collateral estoppel; (2) the interests of Argonaut and the Beagley insurers were not identical; (3) whether collateral estoppel actually applied was irrelevant, what mattered was that the Argonaut decision-makers considered it; and (4) the jury specifically found that there was no significance to any collateral estoppel considerations when the final demand from Hughes was based on only two occurrences.

In reply, Stonewall steadfastly maintains that collateral estoppel is a legal issue that a jury is not allowed to decide. (*See* Reply at 1.) Stonewall notes that this court remarked at a sidebar:

*The Court:* And whether truly collateral estoppel or claim preclusion, or some version of it, applies here is not the issue. It is whether a certain decision-maker thought it might apply or might

not apply. Its true applicability will probably have to be determined by a Judge in a properly brought and briefed motion. But—

*Stonewall's Counsel:* We had submitted one.

(Trial Tr. at 1740–41.) Further, Stonewall refers to the court's statement, when referring to the collateral estoppel argument, that "the jury should not be in a position where it is deciding the applicability of those concepts of law, and as those concepts may be determined under California law." (*Id.*) Moreover, Stonewall claims that the only reason it submitted the collateral estoppel issue to the jury was "to preserve this issue, since the Court had not yet ruled on summary judgment motions." (*Id.*, n. 2.) Finally, Stonewall again asserts that collateral estoppel does indeed apply.

■ The court agrees with Stonewall that the jury's verdict did not moot Stonewall's motion for summary judgment because the motion asserted a purely legal issue. "[A] potentially dispositive legal issue [asserted in a motion for summary judgment] is not rendered moot by a trial." *See Tuohey v. Chicago Park Dist.*, 148 F.3d 735, 739 n. 5 (7th Cir.1998); *see also J.D. Edwards & Co. v. Podany*, 94 C 4865, 1998 WL 292396, at *2 (N.D.Ill. May 20, 1998) ("Collateral estoppel is a question of law to be determined by the court...."), *aff'd*, 168 F.3d 1020 (7th Cir.1999). The court therefore finds the Magistrate Court's Report and Recommendation clearly erroneous and sustains Stonewall's objections. That said, Stonewall's motion for summary judgment is without merit.

*Whether Collateral Estoppel (or Issue Preclusion) Applied*

■ In this case, it is undisputed that the principles of collateral estoppel under California law control. *See McNealy v. Caterpillar*, 139 F.3d 1113, 1116 (7th Cir. 1998) ("Whether a judgment of a state

court results in issue preclusion depends upon the law of that state."). Nonetheless, the doctrine of collateral estoppel under California law is generally consistent with law of the Seventh Circuit. Thus, while primarily relying on California law to determine whether collateral estoppel applies, the court also turns to cases from this circuit for general guidance.[9]

■ "Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Likewise, under California law, collateral estoppel bars relitigation of factual issues necessarily decided in prior litigation. *See Lucido v. Superior Ct.*, 51 Cal.3d 335, 272 Cal.Rptr. 767, 769, 795 P.2d 1223 (1990). There are five requirements before collateral estoppel can be applied under California law: (1) the issue decided previously must be identical to the issue for which preclusion is sought; (2) the issue must actually have been litigated in the first proceeding; (3) a decision on the issue must have been necessary in the first proceeding; (4) the prior decision must have been final and on the merits; and (5) the party sought to be precluded from relitigating the issue must be the same, or in privity with, the party in the first proceeding. *See id.* The party asserting collateral estoppel has the burden of showing that these requirements are satisfied. *See id.*

At the outset, Stonewall places great weight on Argonaut's documented concern that the *Beagley* jury's finding of multiple occurrences would serve as collateral estoppel for Hughes' suit against Argonaut. In short, Stonewall argues that Argonaut itself conceded in correspondence and memoranda that collateral estoppel would

9. The parties cite cases from the Seventh Circuit and the Northern District of Illinois in

their respective briefs.

apply. Argonaut's concern, however, was unfounded, for the court finds that Argonaut was not in privity with Beagley during Beagley's litigation, trial, and eventual settlement with Hughes.[10]

"It is a principle of general application in Anglo–American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he is not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *see also Martin v. Wilks*, 490 U.S. 755, 761–62, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). Furthermore, there is a " 'deep-rooted historic tradition that everyone should have his own day in court.' " *Martin*, 490 U.S. at 762, 109 S.Ct. 2180 (*quoting* 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4449, p. 417 (1981)). "A judgment or decree among parties to a lawsuit resolves issues among them, but it does not conclude the rights of strangers to those proceedings." *Id.*

However, a person in a later suit may be bound by an earlier proceeding where the person, although not a party to the earlier suit, "has his interests adequately represented by someone with the same interests who is a party." *Id.* n. 2. In other words, a person in privity with the earlier litigant or whose interests were "virtually represented" by the earlier litigant is bound by the earlier proceedings. *See generally Tice v. American Airlines*, 162 F.3d 966, 971–73 (7th Cir.1998). The underlying consideration is whether binding the absentee party violates due process. *See Parklane Hosiery Co.*, 439 U.S. at 327 n. 7, 99 S.Ct. 645; *Tice*, 162 F.3d at 971, 973; *Kraushaar v. Flanigan*, 45 F.3d 1040, 1050 (7th Cir.1995). "[T]he privity label simply expresses a conclusion that preclusion is proper." *In Matter of L & S Industries, Inc.*, 989 F.2d 929, 933 (7th Cir.1993).

■■■ California law is the same: "Privity exists where the nonparty has an identity of interest with, and adequate representation by, the party in the first action and the nonparty should reasonably expect to be bound by the prior adjudication." *Helfand v. Nat'l Union Fire Ins. Co.*, 10 Cal.App.4th 869, 13 Cal.Rptr.2d 295, 314 (1992).[11] Moreover, California law recognizes the doctrine of virtual representation, which is "the broadest theory of nonparty preclusion." *Id.* The doctrine provides that "a person not a party to prior action nonetheless is bound if his or her interests are so similar to a party's interest that the latter was the former's virtual representative in the earlier action." *Id.* "In the final analysis, the determination of privity depends upon the fairness of binding [the party] with the result obtained in earlier proceedings in which it did not participate." *Citizens for Open Access to Sand and Tide, Inc. v. Seadrift Assoc.*, 60 Cal.App.4th 1053, 71 Cal.Rptr.2d 77, 88 (1998); *see also Vandenberg v. Superior Ct.*, 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 375, 982 P.2d 229 (1999);

---

**10.** The court therefore need not decide an issue that the parties hotly contest: whether a jury's verdict alone, without entry of judgment because of a subsequent settlement, satisfies the fourth element. The court notes, however, that the Seventh Circuit has suggested that it would. *See Davenport v. DeRobertis*, 844 F.2d 1310, 1313–14 (7th Cir.1988) (stating that a jury's verdict would be binding under the doctrine of collateral estoppel because the doctrine "does not require a final judgment in the conventional sense."); *cf. Citizens for Open Access to Sand and Tide, Inc. v. Seadrift Assoc.*, 60 Cal.App.4th 1053, 71 Cal.Rptr.2d 77, 89 (1998) ("That the prior litigation ended in a settlement rather than a successful judgment after trial does not diminish the worthiness of the effort."). The court also need not address Argonaut's argument that Stonewall improperly attempts to apply collateral estoppel to settlement negotiations.

**11.** The Supreme Court has explained that "[s]tate courts are generally free to develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes." *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 797, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996). The Court, however, noted that federal due process requirements must still be satisfied to bind an absent party. *See id.*

*Sutton v. Golden Gate Bridge, Highway and Transp. Dist.,* 68 Cal.App.4th 1149, 81 Cal.Rptr.2d 155, 158 (1998).

■ First, the court rejects Stonewall's assertion that "Argonaut ... formally intervened in the *Beagley* litigation." (Mem. at 15.) Stonewall fails to show, and there is no indication, that Argonaut did so. Indeed, Argonaut denies that it formally intervened and characterizes Stonewall's assertion as a "false" statement. (Resp. at 5.)

Stonewall's primary argument, however, is that the doctrine of virtual representation applies here. Stonewall argues that

[f]or all intents and purposes, the London insurers in *Beagley* were the same as Argonaut: the *Beagley* trial involved the same claim at issue, the same evidence was being used to prove the facts of the occurrences, the same occurrence policy language was at issue, the litigation was before the same judge before the same court applying the same law in connection with the same policyholder, Hughes.

(Mot. at 14.) Stonewall also contends that Argonaut had notice of the *Beagley* trial and an opportunity to defend. Stonewall's argument is without merit.

What Stonewall ignores is that there is no indication that Argonaut actually participated in the *Beagley* litigation or that it exercised any control or advocacy in the case. *See Helfand v. National Union Fire Ins. Co.,* 10 Cal.App.4th 869, 13 Cal. Rptr.2d 295, 315 (1993) (rejecting "extreme proposition that a nonparty can be bound by a judgment in an earlier proceeding of which he or she did not have notice and notwithstanding that there was virtually no advocacy, no control, and no actual participation in the litigation by the party with 'identical' interests."); *see also National Union Fire Ins. Co. v. Lynette,* 27 Cal.App.4th 1434, 33 Cal.Rptr.2d 496, 507 (1994) (party collaterally estopped from relitigating issue where it had substantially participated in prior proceeding); *Tice,* 162 F.3d at 972 (for doctrine of virtual representation to apply, there must be a

showing that "the second party had participated or had a legal duty to participate."). That Argonaut had notice of the case and that it sent a representative to closely monitor, and even attend, the *Beagley* trial does not suffice. *See Richards,* 517 U.S. at 800 n. 5, 116 S.Ct. 1761 (stating that mere notice may not suffice and that the law does not impose a burden to intervene as a "stranger" when one is absolutely entitled to a hearing). Obviously, Argonaut had a substantial interest in the *Beagley* trial. But that substantial interest, standing alone, is insufficient to support a finding of privity. *See In re Yellow Cab Co.,* 212 B.R. 154, 158 (Bankr.S.D.Cal. 1997) ("[Privity] requires more than a showing of parallel interests—it is not enough that the non-party may be interested in the same questions or proving the same facts.").

■ Further, Stonewall fails to explain how Argonaut had an opportunity to defend or appeal the *Beagley* action. "[A]n unreviewable decision can provide no basis for later imposing on nonparties the preclusive effects of res judicata or collateral estoppel as to issues not fully litigated in any meaningful sense." *Pacific Estates, Inc. v. Superior Ct.,* 13 Cal.App.4th 1561, 17 Cal.Rptr.2d 434, 443 (1993) (*citing* Restatement 2d Judgments, § 28(1), com.(a)); *see also Vandenberg,* 88 Cal.Rptr.2d at 375, 982 P.2d 229 (collateral estoppel inapplicable where there is no opportunity for judicial review of adverse rulings). While Beagley's representatives settled soon after the jury's verdict, Argonaut's counsel may have continued to defend, and to challenge the jury's verdict, throughout the appellate process. Beagley's representation was therefore not adequate; that Argonaut also eventually settled with Hughes does not alter the court's conclusion. In short, despite the *Beagley* jury's verdict, Argonaut was still entitled to its day in court to be heard and to fully litigate the Hughes coverage issue. Therefore, it would be unfair and in violation of due

process to bind Argonaut to the *Beagley* jury's verdict.

For these reasons, the court concludes that Stonewall fails to show that Argonaut was in privity with Beagley in the *Beagley* litigation. Accordingly, collateral estoppel does not apply, and Stonewall's motion for summary judgment is denied.

*Argonaut's Motion for Entry of Judgment*

The court now turns to Argonaut's Motion for Entry of Judgment. As noted above, the jury found in favor of Argonaut across the board. Specifically, the jury (1) awarded Argonaut $2,455,986.35 (plus prejudgment interest) on its breach of contract claim; (2) awarded $6 million in punitive damages on Argonaut's claim that Stonewall breached its duty of good faith; (3) awarded $7 million in punitive damages on its claim that Stonewall breached its duty of utmost good faith; (4) declared that Stonewall was obligated to reimburse Argonaut for the Fullerton Settlement, including defense fees incurred by Hughes in its underlying pollution litigation; (5) declared that Stonewall received all information necessary to evaluate the propriety of the Fullerton Settlement and the basis of coverage for the primary insurance policy and the reinsurance certificate; and (6) answered five Special Interrogatories in favor of Argonaut. Argonaut asks the court to enter judgment on this verdict and to award it prejudgment interest at 7% on $2,408,769.24 from April 10, 1996 (the date it billed Stonewall) to October 16, 1996 and on $2,455,986.35 from October 16, 1996 to the date of this judgment.

Not surprisingly, Stonewall vehemently objects to Argonaut's motion. In its initial objections, Stonewall argues that (1) the court, rather than the jury, must decide its declaratory judgment count because Stonewall did not request a jury trial; (2) Argonaut's prejudgment interest calculation is erroneous because Argonaut incorrectly uses California's applicable rate of interest rather than Illinois' rate of 5%, 815 ILCS 205/2 and because interest should only be calculated from the date this action was filed (May 31, 1996); and

(3) the jury's award of punitive damages is contrary to the law and the evidence.

In response, Argonaut first argues that Stonewall is "estopped" from asking the court to decide its declaratory judgment claim because the parties submitted an "agreed" jury instruction allowing the jury to decide Stonewall's claim and because the jury found in favor of Argonaut's "mirror image" declaratory judgment claim (which Argonaut had requested a jury to decide). Alternatively, Argonaut argues that the jury's fact findings determine the court's ruling on Stonewall's declaratory judgment claim. Additionally, Argonaut argues that California law governs the court's prejudgment interest calculation under Illinois conflict of law rules and disputes Stonewall's claim that interest should not be calculated from April 10, 1996. Finally, Argonaut asserts that Stonewall's objections to the jury's punitive damages award is premature because judgment has yet to be entered.

Once Argonaut's motion was fully-briefed, the court directed Argonaut to submit a "Proposed Judgment Order" reflecting the amounts it claimed from the jury's verdict; the court also granted Stonewall leave to file objections to Argonaut's Proposed Judgement Order. The parties have since extensively briefed the above issues, with Argonaut filing three supplementary briefs and Stonewall two.

In its supplementary briefs, Stonewall repeats its initial objections, but also requests judgment as a matter of law, asserting that Argonaut's evidence was insufficient to establish a reinsured claim under the reinsurance contract. Most notably, however, Stonewall elaborates on its contention that the jury's award of punitive damages is contrary to the law and evidence. Stonewall argues that (1) California law does not allow tort damages against a reinsurer for breach of the implied covenant of good faith and fair dealing; (2) the jury instructions set far too low a standard for awarding punitive because they allowed an award based on a

mere breach of the duty of good faith; (3) there was insufficient evidence to support a finding of malice or egregious conduct necessary to award punitive damages; (4) the jury instructions improperly misled the jury into believing that it could award separate punitive damages for breach of the duty of good faith and for breach of the duty of utmost good faith; and (5) the punitive damages award was excessive and violated due process.

In its supplementary briefs, Argonaut essentially repeats its earlier arguments challenging Stonewall's contentions. However, Argonaut also argues that Stonewall has waived all of its attacks on the jury's award of punitive damages because Stonewall failed to state its objections earlier in this litigation. Finally, Argonaut deems Stonewall's request for judgment as a matter of law as an improper attempt to retry the case. Without further ado, the court address this array of post-trial arguments.

At the outset, the court notes that the parties will have an opportunity to formally attack the court's entry of judgment via motions under Rules 50(b) and 59 of the Federal Rules of Civil Procedure. For now, however, the court limits its review to the propriety of entering Argonaut's Proposed Judgment Order in light of Stonewall's objections. Accordingly, the court declines to address Stonewall's request for judgment as a matter of law at this juncture.

*Whether Punitive Damages are Recoverable*

The first issue that the court addresses is whether the court should enter judgment on the jury's award of punitive damages on Argonaut's claims of breach of duty of good faith and breach of duty of utmost good faith. The sheer amount of that award makes it the primary and initial focus of the court's current review. While Stonewall submits several strong arguments attacking the legality of the jury's award of punitive damages, the court need only address its most forceful one: California law does not allow tort damages against a reinsurer for breach of the implied covenant of good faith and fair dealing. Upon review of California law, the court finds Stonewall's argument persuasive.

Before reviewing California law on this issue, however, the court must briefly address Argonaut's argument that Stonewall has waived its arguments attacking the legality of the jury's award of punitive damages. Specifically, the court agrees that Stonewall belatedly asserted its argument regarding the availability of tort damages to a reinsured for a reinsurer's breach of good faith or utmost good faith under California law. Moreover, it appears that Stonewall has changed its position on this issue during this litigation. Indeed, in its most-recently filed supplementary brief, Stonewall appears to have abandoned this argument. Nevertheless, upon review of California law on this issue, the court cannot allow the jury's award of punitive damages to stand.

The precise issue before the court is whether California law authorizes a reinsured to recover tort damages for its reinsurer's breach of duty of good faith or utmost good faith.[12·] The Supreme Court of California has not addressed this issue. Thus, this court's task is to predict how California's high court would decide. *See Morales v. Cooperative of Amer. Physicians, Inc.*, 180 F.3d 1060, 1063 (9th Cir. 1999). In so doing, the court will "extrapolate" from existing statements of California law and will consider law from other jurisdictions only insofar as they are consistent with the principles of California

---

**12.** For purposes of this discussion, the court need only refer to the breach of duty of good faith and fair dealing ("breach of duty of good faith"). The court adds, however, that Stonewall's argument that Argonaut's separate claims of breach of duty of good faith and breach of duty of utmost good faith are redundant carries weight. *Cf. North River*, 52 F.3d at 1212 (simply referring to the duty of utmost good faith as the duty of good faith). For a historical perspective on the duty of utmost good faith, see *Compagnie de Reassurance v. New England Reinsurance*, 944 F.Supp. 986, 993 (D.Mass.1996).

law. *See Zenith Ins. Co. v. Employers Ins. of Wausau,* 141 F.3d 300, 304 (7th Cir.1998). On that same note, "decisions of the [California appellate] courts control, unless there are persuasive indications that the [California] Supreme Court would decide the issue differently." *Allen v. Transamerica Ins. Co.,* 128 F.3d 462, 466 (7th Cir.1997); *see also Buckley v. Gallo Sales Co.,* 949 F.Supp. 737, 744–45 (N.D.Cal.1996).

At the outset, the court notes that neither its research nor the parties' has found any "authoritative" California decision addressing whether that state's law authorizes a reinsured to recover tort damages for its reinsurer's breach of duty of good faith.[13] The court says "authoritative" because one California appellate court decision (cited by Stonewall) has spoken on the issue and answered the query in the negative, but the California Supreme Court later ordered the opinion "de-published." *See Central Nat'l Ins. Co. v. Prudential Reinsurance Co.,* 241 Cal.Rptr. 773 (Cal. Ct.App.1987), *review denied and ordered not to be officially published* (Cal. Feb. 4, 1988). Where the California Supreme Court orders an opinion "de-published," *see* California Rules of Court, Rule 979, a court or a party cannot cite or rely on that opinion, *see id.,* Rule 977. This practice, however, has been subject to criticism. *See Vu v. Prudential Property & Cas. Ins. Co.,* 172 F.3d 725, 725 (9th Cir.1999) (noting that the "precedential effect of a de-publication order is not entirely clear" and citing articles criticizing the practice); *cf. In re Memorial Hosp. of Iowa County, Inc.,* 862 F.2d 1299, 1302 (7th Cir.1988) ("When a clash between genuine adversaries produces a precedent, however, the judicial system ought not allow the social value of that precedent, created at cost to

the public and other litigants, to be a bargaining chip in the process of settlement."). Moreover, a de-publication order "shall not be deemed an expression of an opinion of the [California] Supreme Court of the correctness of the result reached by the decision or any of the law set forth in the opinion." California Rules of Court, Rule 979(e). Furthermore, "the analysis in an unpublished opinion may properly be considered." *People v. McDaniels,* 21 Cal. App.4th 1560, 27 Cal.Rptr.2d 245, 248 n. 2 (1994).

Given that the court has little "authoritative" guidance from the California courts, it would be far more preferable to certify the issue to the California Supreme Court. *See* California Rules of Court, Rule 29.5. However, this court, as a federal district court, does not have that luxury.[14] Rule 29.5(a); *see also California Teachers Assoc. v. Davis,* 64 F.Supp.2d 945, 951 n. 3 (C.D.Cal.1999); *compare* ILCS S.Ct. Rule 20. Hence, it remains incumbent upon the court to predict how the California Supreme Court would decide the issue.

▮ Although the California Supreme Court has yet to decide whether California law authorizes a reinsured to recover tort damages for its reinsurer's breach of duty of good faith, the high court's pronouncements in opinions addressing the availability of tort recovery in breach of contract cases suggests that it would answer that query in the negative. *See Erlich v. Menezes,* 21 Cal.4th 543, 87 Cal.Rptr.2d 886, 890–93, 981 P.2d 978 (1999) (expressing skepticism on the recovery of tort damages in breach of contract cases); *Cates Construction, Inc. v. Talbot Partners,* 21 Cal.4th 28, 86 Cal.Rptr.2d 855, 864–78, 980

---

**13.** The court recognizes that it is a federal court sitting in Illinois called to predict how the Supreme Court of California would decide this issue. The court should be reluctant to do so and looks forward to California courts', including the California Supreme Court's, disposition of the issue.

**14.** Of course, if this or any comparable case were to be before the Seventh Circuit, and if the Seventh Circuit was concerned that the court inaccurately predicted what the California Supreme Court would itself rule on this issue, the Seventh Circuit could invoke Rule 29.5 and certify the issue to the California Supreme Court. *See* Seventh Circuit Rule 52(a).

P.2d 407 (same, and holding that tort recovery was unavailable for a breach of the implied covenant of good faith in the context of a construction performance bond despite surety bond's similarities to insurance); *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85, 44 Cal.Rptr.2d 420, 425–31, 900 P.2d 669 (1995) (overruling a 1984 California Supreme Court decision that had recognized a tort cause of action based on the defendant's bad faith denial of the existence of a non-insurance contract); *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 227–240, 765 P.2d 373 (providing extensive discussion before holding that tort damages are not recoverable for breach of the implied covenant of good faith in an employment contract). In each of these cases, California law is clear: tort damages are generally not available for a breach of contract. The California Supreme Court has identified the reasons for denying tort recovery in breach of contract cases: (1) the different objectives underlying tort and contract breach; (2) the importance of predictability in assuring commercial stability in contractual dealings; (3) the potential for converting every contract breach into a tort, with accompanying punitive damage recovery; (4) and the preference for legislation in affording appropriate remedies. *See Erlich*, 87 Cal.Rptr.2d at 892, 981 P.2d 978. Further, the court has noted that "[r]estrictions on contract remedies serve to protect the freedom to bargain over special risks and to promote contract formation by limiting liability to the value of the promise." *Id.* at 893, 981 P.2d 978 (citations and internal quotation marks omitted).

However, the California Supreme Court has recognized limited exceptions to the general rule that tort damages are not recoverable for breach of contract. The limited exceptions are where "the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Erlich*, 87 Cal.Rptr.2d at 891, 981 P.2d 978. The most notable exception, well-established

under California law, is that tort damages are available to an insured where the insurer breaches the implied covenant of good faith and fair dealing in an insurance contract. *See id.*; *Cates*, 86 Cal.Rptr.2d at 865, 980 P.2d 407; *Foley*, 254 Cal.Rptr. at 227–28, 765 P.2d 373. The answer in the instant case would thus seem clear: Argonaut is entitled to recover tort damages for Stonewall's breach of the duty of good faith. But the court's inquiry does not end here.

The California Supreme Court has noted that the insurance contract exception (*i.e.*, recognizing that a breach of the implied covenant of good faith and fair dealing provides a basis for recovery in tort) "is a major departure from traditional principles of contract law." *See Cates*, 86 Cal. Rptr.2d at 867, 980 P.2d 407 (quotation marks and citations omitted); *see also Foley*, 254 Cal.Rptr. at 232, 765 P.2d 373. Traditionally, "[b]ecause the covenant of good faith and fair dealing is essentially a contract term that aims to effectuate the contractual intentions of the parties, 'compensation for its breach has almost always been limited to contract rather than tort remedies.'" *Id.* at 865, 980 P.2d 407 (*quoting Foley*, 254 Cal.Rptr. at 227, 765 P.2d 373). Thus, the compensation for the breach of contract traditionally reflects a limited amount predictable at the time the parties entered into the agreement. *Erlich*, 87 Cal.Rptr.2d at 890, 981 P.2d 978; *see also* Cal.Civ.Code §§ 3300, 3301. As alluded to earlier, "[t]his limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." *Erlich*, 87 Cal.Rptr.2d at 890, 981 P.2d 978.

On the other hand, tort damages are less predictable and are "awarded to fully compensate the victim for all injury suffered." *Id.* (citations omitted); *see also* Cal.Civ.Code § 3333. Moreover, punitive damages are recoverable in tort. *See* Cal. Civ.Code § 3294. As the California Su-

preme Court explained, the rationale for the different remedies in contract and tort law is the following: "Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate 'social policy.'" *Erlich*, 87 Cal.Rptr.2d at 890, 981 P.2d 978; *Foley*, 254 Cal.Rptr. at 227, 765 P.2d 373.

Accordingly, California courts have recognized the insurance contract exception because of a number of social policy considerations unique in the insurance context. *See Cates*, 86 Cal.Rptr.2d at 865, 980 P.2d 407; *Foley*, 254 Cal.Rptr. at 228, 765 P.2d 373 ("An exception to this general rule has developed in the context of insurance contracts where, for a variety of policy reasons, courts have held that breach of the implied covenant [of good faith] will provide the basis for an action in tort.").[15] The California Supreme Court discussed these policy reasons in *Cates*, explaining:

> Unlike most other contracts for goods and services, an insurance policy is characterized by elements of adhesion, public interest and fiduciary responsibility. [Citations] In general, insurance policies are not purchased for profit or advantage; rather they are obtained for peace of mind and security in the event of an accident or other catastrophe. [Citation] Moreover, an insured faces a unique "economic dilemma" when its insurer breaches the implied covenant of good faith and fair dealing. [Citation] Unlike other parties in contract who typically may seek recourse in the marketplace in the event of a breach, an insured will not be able to find another insurance company willing to pay for a loss already incurred. In addition ... the tort duty of a liability insurer ordinarily is based on the assumption of the insured's defense and of settlement negotiations of third party claims.

86 Cal.Rptr.2d at 865, 980 P.2d 407; *see also Erlich*, 87 Cal.Rptr.2d at 892, 981 P.2d 978; *Foley*, 254 Cal.Rptr. at 232, 765 P.2d 373 (listing similar factors). The *Cates* court also specifically referred to the "unequal bargaining power" between an insurer and an insured. *See id.* at 871, 980 P.2d 407.

 Thus, in the instant case, this court must carefully review these policy reasons to determine whether the insurance contract exception extends to the reinsurance context. *See Cates*, 86 Cal. Rptr.2d at 871, 980 P.2d 407 ("[W]e must evaluate whether the policy considerations recognized in the common law support the availability of tort remedies in the context of a performance bond.") Upon review of these policy reasons, the court concludes that tort damages for breach of the duty of good faith are not recoverable in the reinsurance context. In other words, the policy reasons that allow an original insured to recover tort damages for its insurer's breach of the duty of good faith under California law do not extend to the reinsurance context to allow a reinsured to recover tort damages against a reinsurer. Indeed, as one commentator has noted, "The primary mistake of most courts considering reinsurance issues is blindly applying principles of original insurance." Thomas, *supra*, at 1597; *cf. Unigard*, 4 F.3d at 1065 ("[C]anons of construction that protect individual purchasers of original insurance policies do not apply to reinsurance.").

Before turning to the relevant policy reasons, the court provides a further review of the business of reinsurance. Reinsurance allows an original insurer to diversify its risk of loss over a larger number of policies and to reduce its capital reserves that state law requires to protect the original insured. *See Unigard*, 4 F.3d at 1053.

---

15. The California Supreme Court has emphasized that the insurance contract exception "has never been predicated upon the existence of legislation regulating the insurance business." *Cates*, 86 Cal.Rptr.2d at 866, 980 P.2d 407; *contrast, e.g., Commercial Union Ins. Co.*, 9 F.Supp.2d at 68–69 (in reinsurance dispute, applying Massachusetts statute that allows one business to sue another for unfair conduct, including acts that are associated with breach of contract).

By purchasing reinsurance, therefore, the original insurer can increase its profitability. *See American Re–Insurance, Co. v. Ins. Com'n of Cal.,* 527 F.Supp. 444, 452 (C.D.Cal.1981).

"[R]einsurance agreements are separate and distinct from the policy agreements entered into by the insurer and its insured." *Id.* Reinsurance involves contracts of indemnity, not liability. *See Unigard,* 4 F.3d at 1054; Cal.Ins.Code § 621. Moreover, the reinsurer is not directly liable to the original insured. *See Unigard,* 4 F.3d at 1054; Cal.Ins.Code § 922.2(c). In fact, the reinsurer has no contact with the insured, *see id.,* and "[t]he original insured has no interest in a contract of reinsurance." Cal.Ins.Code § 623.

Further, the information regarding risks lies with the ceding insurer. *See Unigard,* 4 F.3d at 1066, 1069. Thus, reinsurers do not examine risks, receive notice of loss from the original insured, or investigate claims. *See id.* at 1054. Finally, "[r]einsurance involves two sophisticated business entities familiar with the business of insurance who bargain at arms-length for the terms in their contract." Thomas, *supra,* at 1554; *see also CIGNA,* 52 F.3d at 1213. With this background established, the court turns to its review of the relevant policy reasons. *See Cates,* 86 Cal. Rptr.2d at 871–77, 980 P.2d 407 (reviewing policy considerations before concluding that tort recovery unavailable for breach of covenant of good faith in the context of a construction performance bond.).

As noted above, California allows an insured to recover tort damages for breach of the covenant of good faith in an insurance contract because an insurance policy is characterized by elements of adhesion, unequal bargaining power, public interest, and fiduciary responsibility. Because these elements are either entirely lacking or are present to a much lesser degree in a reinsurance policy, a reinsured cannot recover tort damages for a reinsurer's breach of the covenant of good faith.

It must be emphasized that an original insured, as identified in California courts' discussion of adhesion and unequal bargaining power, is an individual, rather than a commercial entity. *See, e.g., Cates,* 86 Cal.Rptr.2d at 873, 980 P.2d 407 ("*[I]ndividuals* contract with insurance companies. . . .") (emphasis added).[16] Again, the California Supreme Court has noted that, "[i]n general, insurance policies are not purchased for profit or advantage; rather, they are obtained for peace of mind and security in the event of an accident or other catastrophe." *Cates,* 86 Cal.Rptr.2d at 865, 980 P.2d 407. Further, the *Cates* court noted that "the vast majority of [original] insureds must accept insurance on a 'take-it or leave-it basis.'" *Cates,* 86 Cal.Rptr.2d at 871, 980 P.2d 407. These facts are indicative of the unequal bargaining power that often exists between an insurer and an individual insured.

The reinsurance business is different. As already noted, a reinsured is an insurance company that seeks profit and advantage by diversifying its risk. As a commercial enterprise, a reinsured is also a "sophisticated party" to the reinsurance contract. *See* Thomas, *supra,* at 1554; *CIGNA,* 52 F.3d at 1213. *But cf. Zenith Ins. Co.,* 141 F.3d at 305 (underscoring that many original insurance policies are negotiated by sophisticated parties). It follows that a reinsured may employ bargaining tactics that it has already mastered in its own, original insurance business. *See Christiania,* 979 F.2d at 280 (noting that reinsurance contracts are negotiated by "experienced" insurance companies). Moreover, a reinsurer and a reinsured can include penalty provisions in their reinsurance contract, such as a clause for the payment of attorney's fees. Further, a reinsured knows how to employ the legal process to recover for such a breach. And as the Second Circuit has noted, "Because repeat transactions are the norm [in the reinsurance business], reputation is thus important to commercial success and

---

**16.** Of course, commercial entities also pur- chase original insurance.

the loss of repeat business is a penalty that usually outweighs the short-term gains of misrepresentations or stonewalling contractual obligations." *Unigard,* 4 F.3d at 1054. In short, a reinsurance contract is negotiated at "arms-length" just like any other commercial contract. The court therefore finds that, unlike an original insurance policy issued to an individual, a reinsurance policy lacks elements of adhesion or unequal bargaining power.

Next, the public interest in an original insurance policy is far greater than in a reinsurance policy. "[T]he typical insurance policy protects an insured against accidents and generally unforeseeable losses caused by a calamitous or catastrophic event such as disability, death, fire, or flood." *Cates,* 86 Cal.Rptr.2d at 872, 980 P.2d 407. As already noted, a reinsurance policy is a contract of indemnity, not liability; its primary protection is of the reinsured's profit margin. And while original insurers are likewise "for-profit" entities, the California Supreme Court has recognized that original insurers are "quasi-public" because they primarily protect *individuals* from specified economic harm. *See id.* at 873, 980 P.2d 407 (*citing Foley,* 254 Cal.Rptr. at 228, 765 P.2d 373).

This "unique economic dilemma" facing an original insured is distinguished "from the ordinary sort of situation in which a breach of a commercial contract may have merely adverse financial significance to the nonbreaching party." *Cates,* 86 Cal. Rptr.2d at 873, 980 P.2d 407. A reinsurer's breach of a reinsurance contract is more comparable to this "ordinary" breach of a commercial contract. A reinsured has the ability to diversify its risks, and a reinsurance contract may cover only a specified portion of a potential loss. *See Unigard,* 4 F.3d at 1053 ("Spreading the risk prevents a catastrophic loss from falling upon one insurer.").[17] Moreover, the breach does not directly affect the original

insured, for the reinsured is still liable as an original insurer and the reinsurer has no contact with the original insured. This court acknowledges that a reinsurer's breach of the duty of good faith ultimately may seriously affect the reinsured's ability to provide coverage to its other original insureds. *Cf.* Cal.Ins.Code § 922.1(a); *Bluewater Ins. Ltd. v. Balzano,* 823 P.2d 1365, 1367 (Colo.1992) (noting that under Colorado law, "reinsurance has certain advantages which accrue to the insured public as well"). Nonetheless, this court does not believe that recognizing the ripple effects of such a breach warrants a finding of public interest comparable to when an original insurer does the same against its original insured. Indeed, it is not uncommon for a breach of a commercial contract to have some ripple effects on third parties, including individuals.

Finally, the court turns to whether a reinsurer has a "fiduciary responsibility" in dealing with its reinsured. That the duty of good faith applies to both the reinsurer and the reinsured would seem to suggest that a reinsurer does have such a responsibility. The California Supreme Court has observed that " '[i]nsurers hold themselves out as fiduciaries....' " *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 696, 620 P.2d 141 (1979) (*quoting* Goodman & Seaton, Foreword: *Ripe for Decision, Internal Workings and Current Concerns of the California Supreme Court,* 62 Cal.L.Rev. 309, 346–47 (1974)); *see also Gibson v. Gov't Employees Ins. Co.,* 162 Cal.App.3d 441, 208 Cal.Rptr. 511, 513 (1984). California courts, however, have not spoken on the issue in the reinsurance context.

■ This court concludes that a reinsurer owes no fiduciary responsibility to its reinsured. First, the *Egan* court made its observation based on the oft-recited

---

17. The Second Circuit went so far as to make the following analogy: "[Reinsurance] dates back to the time the first bookie, fearful that he could not cover all his bets in the event he were to lose, decided to spread his risk by

'laying-off' some of the risks by getting other bookies to share his exposure." *Continental Cas. Co.,* 77 F.3d at 17. That is not to say, of course, that reinsurance does not serve a legitimate economic purpose.

policy reasons for recognizing the insurer-insured relationship as a "special relationship." *Id.* As explained above, those policy reasons are absent in the reinsurer-reinsured context. Additionally, that a reinsurer owes its reinsured a duty of good faith does not translate into a finding of fiduciary responsibility. *See United States v. Brennan,* 183 F.3d 139, 150 (2nd Cir. 1999) (citing cases to support view that under New York law there was no basis to find fiduciary relationship between reinsurer and reinsured); *Christiania,* 979 F.2d at 280 (rejecting characterization of relationship between reinsurer and reinsured as fiduciary because reinsurance contracts are negotiated at "arms-length"); *Intern'l Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.,* 88 C 320, 1989 WL 165045, at *3 (N.D.Ill.Dec.29, 1989) (in a reinsurance case under Illinois law, stating that "an implied duty of good faith and fair dealing has never been held to constitute a fiduciary duty."). *But cf. Compagnie de Reassur.,* 944 F.Supp. at 995–996 (finding that *reinsured* owed fiduciary duty to its treaty reinsurer). Because the relevant policy reasons inherent in a finding of a fiduciary relationship, *e.g.,* one party's dominance, do not extend to the reinsurance context, this court predicts that the California Supreme Court would adopt the reasoning of these cases and find that a reinsurer does not have a fiduciary responsibility while dealing with its reinsured.

In sum, the relevant policy reasons for allowing an original insured to recover tort damages against its insurer for breaching the covenant of good faith in an insurance contract do not extend to the reinsurance context. The California Supreme Court has "cautioned courts to exercise great care in considering whether to extend the insurance contract exception to another contract setting." *Cates,* 86 Cal.Rptr.2d at 866, 980 P.2d 407 (declining to extend exception to breach of implied covenant of good faith in the context of a surety bond despite its similarities to insurance); *see also Foley,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 227–240, 765 P.2d 373 (declining to extend exception to breach of the implied

covenant of good faith in employment contract). Furthermore, the California Supreme Court has noted that "[c]ourts should be careful to apply tort remedies only when the conduct in question is so clear in deviation from socially useful business practices that the effect of enforcing such tort duties will be to aid rather than discourage commerce." *Erlich,* 87 Cal. Rptr.2d at 893, 981 P.2d 978 (citation and internal quotation marks omitted).

For these reasons, and in the absence of any California court decision addressing the insurance contract exception in the reinsurance context, this court finds that extending the exception here would be contrary to California law. Under California law, a reinsured cannot recover tort damages for its reinsurer's breach of the covenant of good faith in a reinsurance contract. Moreover, California law prohibits an award of punitive damages for breach of contract. *See* Cal.Civ.Code § 3294. Accordingly, the court strikes the jury's $13 million punitive damages award to Argonaut against Stonewall.

*Whether the Court May Decide Stonewall's Declaratory Judgment Count*

 Stonewall asks the court to decide its declaratory judgment count, claiming that it is still a live issue. Stonewall's declaratory judgment count asked the court to declare (1) that Stonewall was entitled to "all information necessary" to evaluate the propriety of the Fullerton Settlement and the basis for Argonaut's coverage and request for indemnification; and (2) that Stonewall was not obligated to reimburse Argonaut unless such information was given. Stonewall did not request a jury.

Nonetheless, Argonaut argues that Stonewall is "estopped" from asking the court to decide its declaratory judgment count because the parties submitted an "agreed" jury instruction allowing the jury to decide Stonewall's claim and because the jury found in favor of Argonaut's "mirror image" declaratory judgment claim (which Argonaut had requested a jury to

decide). Alternatively, Argonaut argues that the jury's fact findings determine the court's ruling on Stonewall's declaratory judgment claim.

The jury found against Stonewall on its declaratory judgment claim, i.e., the jury found that Stonewall received all information necessary to evaluate the propriety of the Fullerton Settlement and the basis of coverage for the primary insurance policy and the reinsurance certificate. The jury's finding on this issue was consistent with the other portions of its verdict in which it found in favor of Argonaut on its breach of contract and declaratory judgment claims. Stonewall asks the court to ignore the jury's findings.

There are, however, several reasons why the court need not address Stonewall's declaratory judgment count. First, Stone-wall abandoned its request for a decision by the court when it tendered its claim to the jury. In fact, Stonewall submits its request for a judgment by the court only in passing, without any discussion. It is not the court's role to construct legal arguments for a party or to identify particular evidence in a trial which weighs in that party's favor. And in any event, the jury's verdict effectively mooted Stonewall's declaratory judgment count. See NUCOR v. Aceros Y Maquilas de Occidente, 28 F.3d 572, 577 (7th Cir.1994) (discussing purpose of Declaratory Judgment Act, 28 U.S.C. § 2201(a)). In light of the jury's verdict, it is within the court's discretion to decline to decide Stonewall's declaratory judgment count. See North Shore Gas Co. v. Salomon, Inc., 152 F.3d 642, 647 (7th Cir.1998); Matter of VMS Securities Litig., 103 F.3d 1317, 1327 (7th Cir.1996); Tempco Elect. Heater Corp. v. Omega Eng., Inc., 819 F.2d 746, 747 (7th Cir.1987). "[A] district court should not grant declaratory relief unless there is an actual, 'substantial controversy, between parties having adverse legal interests, of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment.'" NUCOR, 28 F.3d at 577 (quoting Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).

*Prejudgment Interest Calculation*

Argonaut asks the court to award it prejudgment interest at 7% on its breach of contract award. Argonaut asserts that prejudgment interest should be calculated on $2,408,769.24 from April 10, 1996 (the date it billed Stonewall) to October 16, 1996 and on $2,455,986.35 from October 16, 1996 to the date of this judgment. Argonaut's 7% rate of interest is based on California law. Stonewall, on the other hand, contends that Illinois' 5% rate of interest should apply. Further, Stonewall argues that prejudgment interest should be awarded only from the date this action was filed—May 31, 1996.

First, the court addresses Stonewall's contention that Illinois' 5% rate of interest should apply. Here, the parties did not include an express choice of law provision in their reinsurance policies. Thus, this court, as "[a] district court exercising jurisdiction because of the diversity of citizenship of the parties[,] must apply the choice of law rules of the state in which it sits." Curran v. Kwon, 153 F.3d 481, 488 (7th Cir.1998). Accordingly, this court must apply Illinois' choice of law rules governing contracts. See id. Illinois' approach is to select the jurisdiction with the most significant contacts with the transaction and the parties. See id. The court must therefore consider "the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract and the domicile and nationality of the parties." Id.; see also Lapham–Hickey Steel Corp. v. Protection Mut. Ins. Co., 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842, 845 (1995).[18]

18. These factors of course apply to the application of California law for the issues already discussed in this opinion. It is only on the issue of prejudgment interest, however, has a choice of law objection been made. Compare Mutuelle Gen. Franc. Vie v. Life Assur. Co. of Penns., 688 F.Supp. 386, 391 (N.D.Ill.1988) (where parties ignored choice of law issue, court found that they stipulated to application of Illinois law).

Initially, the court notes that Stonewall provides no reason why Illinois law and its 5% rate of interest should apply. It should also be noted that Stonewall has largely remained silent on the application of California law on other issues throughout this case. *See Mutuelle Gen. Francaise Vie,* 688 F.Supp. at 391. In fact, the only apparent Illinois contact in this litigation is noted in Stonewall's venue statement in its complaint: "Argonaut maintains a special claims office at 8750 W. Bryn Mawr Ave., Ste. 1300, Chicago, Illinois, to handle environmental claims, and substantially all the communications to or from Argonaut in connection with the events giving rise to this Complaint took place there." (Compl. at ¶ 4.) In any event, there are significant contacts to California to warrant the application of California law and its 7% rate of interest: (1) Argonaut is a California corporation; (2) Hughes Aircraft, the insured, was a California corporation; (3) the reinsurance contracts were countersigned in California; (4) the reinsurance contracts were brokered and delivered in California; and (5) Stonewall is authorized to do business in California.

Finally, the court turns to the appropriate date from which the prejudgment interest should accrue. Section 3287 of the California Civil Code provides:

(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state.

(b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed.

Cal.Civ.Code § 3287. Because it is not clear that Argonaut's breach of contract damages were capable of being made certain on April 10, 1996, the court concludes that subsection (b) applies and interest should accrue from May 31, 1996. *See* § 3287(b).

## III. CONCLUSION

The court (1) sustains Stonewall's objections to the Magistrate Court's Report recommending that Stonewall's motion for summary judgment be denied as moot; (2) denies Stonewall's motion for summary judgment because collateral estoppel would not have barred Argonaut from litigating the issue of number of occurrences after the conclusion of the *Beagley* litigation; (3) strikes the jury's $13 million award of punitive damages to Argonaut because under California law tort damages are not recoverable for breach of the covenant of good faith in the reinsurance context; (4) dismisses as moot Stonewall's declaratory judgment count; and (5) finds that California's 7% interest rate on prejudgment interest applies from May 31, 1996. Argonaut shall submit a judgment order consistent with this opinion by December 15, 1999.

IT IS SO ORDERED.