**EMPLOYERS REINSURANCE CORPORATION, Plaintiff,**

v.

**MID–CONTINENT CASUALTY COMPANY, Defendant.**

**No. CIV.A. 01–2058–KHV.**

United States District Court, D. Kansas.

May 23, 2002.

See also, 202 F.Supp.2d 1212.

Douglas R. Richmond, Gerald A. King, Carlton D. Callenbach, Armstrong Teasdale LLP, Kansas City, MO, for Plaintiff.

Vincent F. O'Flaherty, Christopher J. Carpenter, Niewald, Waldeck& Brown, P.C., Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Employers Reinsurance Corporation ("ERC") brings suit against Mid–Continent Casualty Company ("MCCC") to determine whether the parties' reinsurance agreement requires it to reimburse MCCC for certain fees and expenses which MCCC incurred in declaratory judgment actions with its insureds. This matter comes before the Court on *Defendant Mid–Continent Casualty Company's Motion For Summary Judgment* ("MCCC Motion For Summary Judgment") (Doc. # 71) and *Plaintiff Employers Reinsurance Corporation's Motion For Summary Judgment* ("ERC Motion For Summary Judgment") (Doc. # 74), both filed February 8, 2002, *Defendant's Motion To Strike New Material In Plaintiff's Reply Memorandum In Support Of Its Motion For Summary Judgment Or, In The Alternative, For Leave To File A Surreply* (Doc. # 91) filed April 3, 2002, *Defendant's Motion For Leave To Supplement Summary Judgment Pleadings* ("MCCC's Motion For Leave") (Doc. # 105) and *Defendant's Motion To Shorten Time For Plaintiff To Respond To Defendant's Motion For Leave To Supplement Summary Judgment Pleadings And Defendant's Supplement To Summary Judgment Memoranda* (Doc. # 104), both filed May 22, 2002. As a preliminary matter, the Court allows MCCC leave to file a surreply. For reasons set forth below, the Court sustains in part MCCC's motion for summary judgment, overrules ERC's motion for summary judgment and overrules as moot MCCC's motions for leave to supplement and to shorten the time for ERC to respond.

## I. Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the non-moving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *See Applied Genetics,* 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## II. Facts

The following facts are either undisputed or, where disputed, each party's factual contention is stated.[1]

MCCC is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma. MCCC is a small regional insurance company. It is a member and/or subsidiary of the Great American Insurance Group ("GAIG"), which is one of the 30 largest property and casualty groups in the United States. GAIG is a financially strong insurance group. MCCC writes approximately $200 million per year in gross

---

1. The Court ignores MCCC fact paragraphs which are not properly supported under Rule 56, Fed.R.Civ.P. MCCC fact paragraph 3, for example, contains statements regarding the nature of MCCC's business. *See Defendant Mid–Continent Casualty Company's Memorandum In Support Of Its Motion For Summary Judgment ("MCCC Memorandum")* (Doc. # 90) filed February 8, 2002 at 2. MCCC cites its counterclaim to support the assertions. *See id.* In its reply to the counterclaim, however, ERC denied the allegations. *See Exhibit 3, MCCC Motion For Summary Judgment.* Also, the Court omits factual assertions of both parties which are irrelevant, immaterial or argumentative.

property and casualty insurance premiums.

For 30 years, from December 31, 1970 through April 1, 2000, MCCC purchased reinsurance coverage from ERC, a Missouri corporation with its principal place of business in Overland Park, Kansas. From January 1, 1994 through April 1, 2000, ERC and MCCC operated under the Liability Excess Reinsurance Agreement (the "Agreement").[2] ERC drafted and signed the Agreement and amendments thereto. MCCC accepted and signed the Agreement and amendments in Tulsa, Oklahoma. The wording of the 1994 Agreement closely resembles the wording of previous reinsurance agreements between ERC and MCCC.

Reinsureds typically negotiate the terms, conditions, provisions and rates in their reinsurance agreements. Unlike standard insurance policies, reinsurance agreements result from negotiations and are not offered on a take it or leave it basis. ERC maintains that reinsurers and reinsureds have equal bargaining power to determine the language in their reinsurance agreements. MCCC's expert witness, Robert F. Hall, testified that beginning in 1982, reinsurers changed their position with respect to payment of declaratory judgment expenses and, without informing reinsureds of the change in position, began a concerted effort to avoid paying such expenses.[3]

MCCC had an opportunity to negotiate specific terms of the Agreement, to review the language and to make any changes before executing it. MCCC president Jimmy L. Pierce negotiated the Agreement for MCCC. Pierce had negotiated two other reinsurance agreements with ERC. Pierce did not believe that he needed to include any key terms or provisions in the Agreement. He does not recall any discussions about the definitions of "loss" or "claim expenses," or whether the definitions were broad enough to include fees and expenses which MCCC incurred in declaratory judgment actions. MCCC did not believe that ERC took unfair advantage in negotiating the Agreement.

Under the Agreement, ERC agreed to indemnify MCCC for all "losses" in excess of $300,000 for each occurrence, with a reinsurance limit of $1,000,000 for each occurrence. With respect to "losses," the Agreement states:

*DEFINITIONS OF LOSS AND CLAIM EXPENSES.* The word "loss" shall mean only such amounts:

(a) within applicable policy limits as are actually paid by [MCCC] in settlement of claims or in satisfaction of awards or judgments (including prejudgment interest and plaintiff's costs included in the judgment and subject with the judgment to the applicable policy limit);

(b) equal to 80% of the amount paid by [MCCC] in excess of applicable third party liability coverage policy limits occasioned by liability imposed upon [MCCC] on account of the failure of [MCCC] to settle a claim for an amount within such policy limits;

(c)(1) equal to 80% of the amount paid by [MCCC] for punitive, exemplary, or compensatory damages awarded to the insured and arising out of the conduct of [MCCC]

---

2. MCCC terminated the Agreement in April 2000 and obtained reinsurance from General Reinsurance Corporation ("GRC"). The GRC reinsurance agreement specifically covers declaratory judgment fees and expenses.

3. Hall testified that until the early 1980s, the industry custom and practice was to pay declaratory judgment fees and expenses. ERC's expert, James Powers, testified that industry custom and practice is to not pay such fees and expenses.

in the investigation, trial or settlement of any claim or failure to pay or delay in payment of any benefits under any policy if [ERC] has not, in advance of any such conduct by [MCCC], counseled with [MCCC] and concurred in [MCCC's] course of conduct; or

(c)(2) equal to 100% of the amount paid by [MCCC] for punitive, exemplary, or compensatory damages awarded to the insured and arising out of the conduct of [MCCC] in the investigation, trial or settlement of any claim for failure to pay or delay in payment of any benefits under any policy if [ERC] has, in advance of any such conduct by [MCCC], counseled with [MCCC] and concurred in [MCCC's] course of conduct;

Agreement, Article VII, Exhibit 1, *Exhibits To Plaintiff Employer Reinsurance Corporation's Motion For Summary Judgment ("ERC Exhibits")* (Doc. # 76) filed February 8, 2002. ERC maintains that MCCC negotiated provisions (c)(1) and (c)(2) in attempt to obtain reinsurance for extra-contractual liability or bad faith liability. MCCC agrees with the purpose of the provisions, but states that ERC offered the additional language and coverage.

The Agreement requires ERC to indemnify MCCC for proportional claim expenses:

*INDEMNITY FOR CLAIM EXPENSES.* [ERC] hereby agrees that, as respects reinsurance afforded by the other terms of this agreement, [ERC] will, with respect to each occurrence, indemnify [MCCC] against that proportion of claim expenses paid by [MCCC] that the amount of loss ultimately borne by [ERC] bears to the total amount of loss: Provided, however, that in the event a verdict, award or judgment is reduced by compromise settlement or an award or judgment is reduced or reversed by appeal taken by [MCCC] from an award or judgment, [ERC] shall indemnify [MCCC] against claim expenses paid by [MCCC] connected with such settlement or appeal in the same ratio that the benefit derived by [ERC] from such reduction or reversal bears to the total benefit resulting from such reduction or reversal.

Agreement, Article IX.

The Agreement defines "claim expenses" as follows:

The term "claim expenses" shall mean all payment under the supplementary payments provisions of [MCCC's] policy, including court costs, interest upon judgments, and allocated investigation, adjustment, and legal expenses.

Agreement, Article VIII.[4]

The Agreement excludes the following from the definitions of "loss" and "claim expenses":

(a) salaries paid to employees of [MCCC]; [and]

(b) any statutory penalties imposed upon [MCCC] on account of any un-

---

4. The parties amended the definition of "claim expenses" for occurrences on or after January 1, 1998:

The term "claim expenses" shall mean all payments under the supplementary payments provisions of [MCCC's] policy, including court costs, interest upon judgments and investigation, adjustment, and

legal expenses incurred by persons who are not employees of [MCCC] or of any subsidiary(ies) or affiliated company(ies) of [MCCC].

Agreement, Amendment No. 4. The amended definition does not apply in this case, however, because the occurrences happened before January 1, 1998.

fair trade practice or any unfair claim practice.

Agreement, Article VIII.

The policies which MCCC issued to its insureds contained the following supplementary payments provision:

SUPPLEMENTARY PAYMENTS—COVERAGES A AND B

■ We will pay, with respect to any claim we investigate or settle or "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accident or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", [sic] including actual loss of earnings up to $100 a day because of time off from work.

e. All costs taxed against the insured in the "suit". [sic]

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in a court the part of judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

*ERC Exhibits*, Exhibit 2 at 4. Under the supplementary payments provision, MCCC pays defense costs on behalf of its insureds in underlying liability actions. Such amounts do not reduce the insured's liability limit under the policy.[5]

ERC maintains that when the parties negotiated the Agreement in 1994, ERC had different language which it used to define "claim expenses" when it intended to cover declaratory judgment fees and expenses. In 1995 and 1996, ERC provid-

---

**5.** ERC cites the testimony of MCCC expert Robert F. Hall that "[d]eclaratory judgment expenses are not paid under the supplementary payments provision of a commercial general liability ("CGL") insurance policy.". *ERC Memorandum,* ¶ 73 (citing ERC Exhibit 5, p. 10 ll. 7–10). To the extent that Hall's testimony constitutes a legal conclusion, it is inadmissible. *See A.E. By & Through Evans v. Indep. Sch. Dist. No. 25,* 936 F.2d 472, 476 (10th Cir.1991) (expert may not apply law to facts of case to form legal conclusions); *see also Citizens Ins. Co. of Am. v. Charity,* 871 F.Supp. 1401, 1402–03 (D.Kan.1994) (construing as matter of law whether supplementary payments provision covers insured's declaratory judgment fees and expenses); *Church Mut. Ins. Co. v. Redeemer Lutheran Church,* No. C0–97–2002, 1997 WL 878651 at

\*2 (Minn.Ct.App.1998) (same). Thus, the Court can consider such testimony only to the extent that it addresses a factual issue such as custom and practice in the industry. Because the contract language is not ambiguous, however, the Court does not consider extrinsic evidence regarding the parties' treatment of declaratory judgment expenses. *See Lewis v. Sac & Fox Tribe of Okla. Hous. Auth.,* 896 P.2d 503, 514 (Okla.1994) (language of complete and unambiguous contract only legitimate evidence of parties' intent); *Founders Bank & Trust Co. v. Upsher,* 830 P.2d 1355, 1361–62 (Okla.1992); *State ex rel. Com'rs of Land Office v. Butler,* 753 P.2d 1334, 1336 (Okl.1987) (extrinsic evidence not admissible to determine meaning of unambiguous contract).

ed reinsurance contracts to other companies which specifically covered declaratory judgment fees and expenses as "claim expenses." The contracts provided:

> The term "claim expenses" shall mean all payments under the supplementary payments provision in the REIN-SURED's policy, including court costs, interests upon judgments, and allocated investigation, adjustment, and legal expenses *and amounts paid by the REIN-SURED as declaratory judgment expenses or other expenses incurred to determine the defense or indemnification obligations of a specific policy reinsured under this Agreement.*

Exhibit 10, *ERC's Exhibits* (emphasis added). Since before 1990, ERC has required that an underwriting manager approve reinsurance coverage for declaratory judgment costs, expenses and attorney's fees.

Beginning in 1995, ERC drafted an online underwriting manual. With respect to declaratory judgment expenses, the manual provides:

> If it is the intent of the underwriter to include recovery for DJ expense, the ERC wording must be modified to specifically reflect the inclusion of DJ action expense. Visit with the ERC Legal Department for appropriate wording to incorporate recovery of DJ expenses.

The manual further provides:

> **Points to Consider:**
>
> ● Expense recovery under "standard" ERC treaty wording is generally limited to those expenses covered by the supplementary payments section of a reinsured policy.
>
> \* \* \* \* \* \*

**Treatment of DJ expense under Pro-Rata Expense Recovery:**

> \* \* \* \* \* \*
>
> ● If a client *loses* the DJ action, policy loss excess of the retention is recoverable from ERC, as is the proportional share of expenses related to the defense and settlement of the claim. Technically, DJs [sic] expenses are not recoverable as they did not arise from the reinsured policy. (Although clients will sometimes attempt to include their failed DJ action expense under this scenario).

Exhibit 48, *Employers Reinsurance Corporation's Reply Memorandum In Further Support Of Its Motion For Summary Judgment ("ERC's Reply")* (Doc. # 89) filed March 25, 2002. ERC maintains that its underwriting manual reduced to writing its long-standing position since at least 1978 that it does not reinsure declaratory judgment expenses absent an express agreement to do so.

Loss adjustment expenses can generally be divided into two categories: allocated and unallocated. Unallocated loss adjustment expenses ("ULAE") includes things such as salaries to an insurer's claim staff, which cannot be identified as going to a particular claim. MCCC Expert Robert F. Hall testified that he has never heard anyone refer to the insured's declaratory judgment expenses as allocated loss adjustment expenses ("ALAE"). He also testified that an insurance company cannot treat such expenses as ALAE on its books.[6]

**A. Power Machinery Claim**

On July 26, 1994, an injured employee of PWR Mac, Inc. d/b/a Power Machinery

---

**6.** The Court does not consider MCCC fact paragraphs which are supported by only an expert report. *See Sofford v. Schindler Elev. Corp.*, 954 F.Supp. 1459, 1462–63 (D.Colo. 1997) (unsworn expert report not competent evidence for consideration on summary judgment ruling).

Constructors Division ("Power Machinery") sued Chevron Corporation ("Chevron"). Chevron sought indemnification under an insurance policy which MCCC had issued to Power Machinery. On June 26, 1996, MCCC advised ERC of the claim.

By letter dated December 2, 1996, MCCC informed ERC that a trial judge had ruled in favor of the injured employee and against Chevron in the underlying liability suit. *See* Exhibit 10, *MCCC Motion For Summary Judgment.* MCCC further advised:

> As you will recall we were defending this matter under a reservation of rights and will be appealing the matter accordingly.

> We are also in the process of analyzing the feasibility of moving for a dec [sic] action as to the coverage available to Chevron under this policy.

> I will continue to keep you advised as this case develops....

*Id.*

The next day, on December 3, 1996, MCCC filed a declaratory judgment action against Chevron in the United States District Court for the Eastern District of Texas. On December 9, 1996, ERC asked MCCC to provide information regarding the likelihood of filing a declaratory judgment action. On December 13, 1996, MCCC informed ERC that it had already filed a declaratory judgment action.

ERC conducted claims file audits on the Power Machinery claim on September 30, 1997 and July 26, 2000.[7]

During a claims audit at MCCC offices in June 1998, Clay Crawford, ERC claims counsel, told Kirby Pancoast, MCCC vice president of claims, that he was not sure whether the Agreement covered declaratory judgment expenses.[8] Pancoast expressed his belief that such expenses were covered. Crawford suggested that they each review the matter and discuss it later. Pancoast recalls that Crawford told him that if MCCC pressed the matter, ERC would concede. In the fall of 1998, Crawford told Pancoast that ERC's position was that the Agreement did not cover declaratory judgment expenses.

The district court awarded $539,402.88 to Chevron for attorneys fees and costs which it incurred in both the underlying action and the declaratory judgment action.[9] An appellate court reversed and remanded, however, and in August 2000, MCCC agreed to pay $310,000 to settle the matter.

In its reinsurance billing to ERC in March and August 2000, MCCC billed a gross loss of $652,360.62 for the Power Machinery claim: $342,360.62 for amounts which it had paid to claimants in the underlying action and $310,000 for amounts which it had paid for Chevron attorneys' fees in both the underlying action and the

---

**7.** MCCC contends that it kept ERC informed of the status of the Power Machinery claim throughout the life of the claim; however, it does not cite record evidence to support this assertion. *See MCCC Memorandum,* ¶ 20. MCCC cites irrelevant deposition testimony of John Delaney, one letter sent in 1996, two letters sent in 1998 and a stack of computer records. *See* Exhibits 8, 12, 13, 14 and 15, *MCCC Motion For Summary Judgment.* The dates of the letters indicate that MCCC informed ERC of the status of the claim once in 1996 and twice in 1998. The Court does not consider any hearsay statements within the letters which may refer to communications between the parties on other dates. MCCC provides no clue as to how the Court should interpret the computer records, and the Court is unable to determine that such records support MCCC's contention.

**8.** The discussion apparently arose in the context of the Power Machinery claim, but it is unclear whether Crawford was conducting a claims file audit of the Power Machinery claim at the time of the discussion.

**9.** The record is unclear regarding the date of the district court judgment.

declaratory judgment action. On October 18, 2000, ERC informed MCCC that it could not determine whether the Agreement covered the submitted expenses. By letters dated January 17, 2001 and February 5, 2001, ERC denied MCCC's claim for attorneys' fees awarded to Chevron in the declaratory judgment action. Prior to these letters, ERC did not issue a non-coverage letter which advised MCCC that ERC was taking this position.

## B. Safe Tire Claim

The Safe Tire claim arose out of a fire on December 1, 1995 at Safe Tire Disposal Corporation ("Safe Tire"), an MCCC insured. Nearby property owners filed claims against Safe Tire for bodily injury and property damage caused by smoke from the fire. MCCC denied coverage and refused to provide a defense based on the policy's pollution exclusion.

On October 3, 1996, Safe Tire filed a declaratory judgment action against MCCC in Ellis County, Texas. Almost two years later, on May 18, 1998, MCCC sent a letter which notified ERC of the action. MCCC also informed ERC that the trial judge had ruled against it, but that MCCC planned to appeal.[10] MCCC explained the basis for its position that the pollution exclusion applied and provided information on the claim and coverage limits. MCCC ultimately lost on appeal and

was required to reimburse Safe Tire for payments Safe Tire had made to defend and settle the underlying claims and fees and expenses which Safe Tire incurred in the declaratory judgment action. *See MCCC v. Safe Tire*, 16 S.W.3d 418 (Tex. App.2000).

On November 3, 1998, July 12, 1999 and July 26, 2000, ERC conducted claims file audits on the Safe Tire claim.[11]

On October 24, 2000, MCCC submitted reinsurance billing for the Safe Tire claim in the total amount of $393,929.78. Of the total loss, $208,500.00 was for funds which MCCC had paid to claimants in the underlying action; $80,432.53 was for attorneys' fees awarded to Safe Tire in the underlying action; $53,530.00 was for attorneys' fees awarded to Safe Tire in the declaratory action; $15,000.00 was for attorneys' fees awarded to Safe Tire on appeal of the declaratory judgment action; and $36,467.25 involved post-judgment interest on the attorneys' fees awarded in the declaratory judgment action. On February 5, 2001, ERC denied MCCC's claim for reimbursement. On June 7, 2001, it notified MCCC that the Safe Tire loss and claim expenses did not exceed the $300,000 retention requirement.[12] Prior to 2001, ERC did not advise MCCC in writing that the Agreement did not cover expenses relating to the declaratory judgment action regarding the Safe Tire claim.[13]

---

10. On May 18, 1998, MCCC also filed a separate declaratory judgment action against Safe Tire in Bexar County, Texas. The Bexar County judge refused to rule against the Ellis County court and dismissed the case.

11. MCCC contends that it kept ERC informed of the status of the underlying claim and the declaratory judgment action regarding the Safe Tire Claim. *See MCCC Memorandum*, ¶ 28. MCCC does not cite record evidence, however, to support this assertion. MCCC cites four letters which were sent in 1998, and a stack of computer records. *See* Exhibits 13, 18, 21, 22 and 23, *MCCC Motion For Summary Judgment*. The letters suggest that

MCCC kept ERC informed during 1998 but the Court does not consider any hearsay statements which may refer to communications between the parties on other dates. MCCC provides no clue as to how the Court should interpret the computer records, and it cannot determine whether such records support MCCC's contention.

12. The February 5, 2001 letter did not mention a failure to satisfy the $300,000 retention.

13. ERC points out that in the fall of 1998, Crawford told Pancoast that ERC's position was that the Agreement did not cover declaratory judgment expenses.

## C. Air Equipment Claim

On June 23, 1996, an employee of Air Equipment, Inc. ("Air Equipment") was injured while working on a drilling rig. Swift Energy Company ("Swift") leased and operated the drilling site. Swift had hired Flournoy Drilling Company ("Flournoy") to drill the well, and Flournoy had retained Air Equipment to provide a crew to install casing at the site. The injured employee sued Swift and Flournoy for negligence. Both companies requested that MCCC provide coverage under a policy issued to Air Equipment. On November 11, 1996, MCCC notified ERC of the claim.

On September 3, 1997, MCCC informed ERC that it might file a declaratory action regarding the Air Equipment claim. Two days later, on September 5, 1997, MCCC filed a declaratory judgment action against Swift and Flournoy in the United States District Court for the Southern District of Texas. On November 4, 1997, MCCC informed ERC that it had filed suit.

On September 30, 1997, November 3, 1998 and July 12, 1999, ERC conducted claims file audits on the Air Equipment claim.[14]

The district court granted summary judgment in favor of MCCC, but the appellate court reversed. *See MCCC v. Swift Energy Co.*, 206 F.3d 487 (5th Cir.

2000). On remand the district court entered judgment in favor of Swift for $1,000,000.00 in actual damages and $93,651.00 in attorneys' fees and costs in the underlying action. The district court refused to award attorneys' fees and expenses which Swift had incurred in the declaratory judgment action.[15]

On May 16, 2001, MCCC submitted $1,329,920.20 in reinsurance billing for the Air Equipment claim: $1,000,000 for funds which MCCC had paid to claimants in the underlying action; $93,651.00 for attorneys' fees awarded to Air Equipment in the declaratory judgment action; and $236,269.20 for pre-judgment interest. On May 21, 2001, ERC informed MCCC that the Agreement might not cover declaratory judgment fees and expenses. By letters dated January 17, 2001 and February 5, 2001, ERC denied MCCC's claim for attorneys' fees awarded to Air Equipment in the declaratory judgment action.[16] Prior to these letters, ERC did not issue a non-coverage letter which advised MCCC of its position that the Agreement did not cover fees and expenses in a declaratory judgment action.

## D. The Parties' Intentions

MCCC contends that it intended and understood that the Agreement's definition of "claim expenses" required ERC to pay

---

**14.** MCCC contends that it kept ERC informed of the status of the underlying claim and declaratory judgment action regarding the Air Equipment claim, but it does not cite record evidence to support this assertion. *See MCCC Memorandum,* ¶ 37. MCCC cites irrelevant deposition testimony of John Delaney, one letter sent in 1996, a letter sent in 1996, a letter sent in 1997 and a stack of computer records. *See* Exhibits 8, 13, 15 and 24, *MCCC Motion For Summary Judgment.* The dates of the letters indicate that MCCC informed ERC of the status of the claim once in 1996 and once in 1997. The Court does not consider any hearsay statements within the letters

which may refer to communications between the parties on other dates. MCCC provides no clue as to how the Court should interpret the computer records, and the Court is unable to determine whether such records support MCCC's contention.

**15.** The remand judgment applied only to Swift because Flournoy did not appeal the original district court ruling.

**16.** The record does not explain why ERC issued the declination letters before MCCC submitted its reinsurance billing on the Air Equipment claim.

fees and expenses which it incurred in declaratory judgment actions. ERC maintains that it did not intend to provide reinsurance coverage for declaratory judgment costs, expenses or attorney's fees. ERC contends that such amounts are not within the scope of its standard reinsurance language, and that its intent in drafting the Agreement was to reimburse only those expenses paid under the supplementary payment provisions of MCCC policies. ERC further asserts that it provides coverage for declaratory judgment fees and expenses only when the reinsured bargains for such coverage and agrees to pay higher premiums.

MCCC is obligated to handle claims as though it does not have reinsurance coverage. MCCC does not recall discussing the Power Machinery, Safe Tire and Air Equipment ("current claims") declaratory judgment actions with ERC before filing them. MCCC filed the actions because it believed that its policies did not provide coverage. MCCC decided to pursue the declaratory judgment actions for its own benefit. It did not make the decisions with ERC in mind.

Before ERC declined to reimburse MCCC for declaratory judgment fees and expenses, MCCC believed that it had an excellent relationship with ERC and that ERC was not acting in bad faith. MCCC agrees that ERC's act of filing this action does not constitute bad faith. Rather, MCCC asserts that ERC's counterclaim to recoup its previous payments to MCCC for

fees and expenses in declaratory judgment actions constitutes bad faith.

### E. Past Payments For Declaratory Judgment Fees And Expenses

During the time that the Agreement was in effect, ERC reimbursed MCCC for declaratory judgment fees and expenses in the following amounts: $16,443.57 for the Cavender Oldsmobile claim; $35,868.41 for the Fred Haas Toyota claim; $51,991.88 for the Clearstream Wastewater claim; and $30,397.29 for the Apache Abrasives claim ("past claims").[17]

The parties dispute whether ERC knew or should have known that MCCC's reinsurance billings on the past claims included declaratory judgment fees and expenses. ERC maintains that it did not knowingly reimburse MCCC for declaratory judgment fees or expenses. It claims that it has since learned that MCCC itemized the past claims as claim expenses for bodily injury or property damage. ERC contends that MCCC did not indicate that it sought reimbursement for declaratory judgment fees and expenses. MCCC submitted an itemized statement of all payments made by MCCC to third parties, including various payments to the law firm Brian Blakeley & Associates ("Blakeley firm") for fees and expenses of MCCC counsel in declaratory judgment actions.[18] The billings did not specify the purpose of the payments. At the time it received the billings, however, ERC knew that MCCC had pursued declaratory judgment actions regarding the past claims.[19] ERC also

---

**17.** The record is unclear whether MCCC incurred the fees and expenses on its own behalf, or whether it was required to reimburse its insureds for such amounts.

**18.** The first page of the reinsurance billings submitted by MCCC is a form provided by ERC. MCCC generated the remaining pages on its own computers. ERC does not require that its reinsureds use certain forms when submitting reinsurance billings. The majority

of ERC reinsureds submit reinsurance billings on their own forms.

**19.** ERC attorney Clay Crawford had met with Marie Miller, an attorney with the Blakeley firm, with regard to the Clearstream Wastewater claim. Miller acted as coverage counsel in the declaratory judgment action. Crawford and Miller discussed coverage issues, as well as underlying liability issues. Also present was another attorney who was handling the underlying case against the in-

knew that MCCC used the Blakeley firm for just about any legal need that it had in Texas, including most of its coverage issues.[20] MCCC did not attempt to identify or segregate declaratory judgment expenses in its reinsurance billings. ERC trusted that MCCC would seek reimbursement for only those costs or expenses which are covered under the Agreement.

### F. ERC Attorney Clay Crawford

Clay Crawford is a licenced attorney in Missouri. In February 1996, ERC hired Crawford to work in its specialty claims department. In April 1997, Crawford became claims counsel in the property and casualty reinsurance claims department. Several months later, ERC promoted Crawford to assistant secretary. As assistant secretary, Crawford continued to do the same work as claims counsel. His duties included managing his accounts and taking whatever action was necessary to administer the accounts on behalf of ERC. More specifically, his duties included reviewing reinsurance claims, approving billing payments, conducting file reviews and providing services such as presentations, seminars, assistance on individual claims files and attending mediations.

From April 1997 to December 14, 1999,[21] Crawford was responsible for handling the MCCC account, along with 20 to 25 other accounts. During this time, Crawford tried to audit claims files at MCCC offices at least twice a year. Crawford was satisfied with the adequacy and frequency of the claim status reports provided by MCCC. As claims counsel, Crawford prepared a presentation which advised ERC insureds that "if serious coverage issues

exist, file a declaratory judgment action and divide the file." *MCCC Exhibit* 7.2. Crawford provided a copy of the presentation to MCCC.

### III. Analysis

Both parties seek declaratory judgment regarding whether the Agreement covers MCCC's own declaratory judgment fees and expenses and declaratory judgment fees and expenses awarded to MCCC insureds. ERC also asserts claims for breach of contract, misrepresentation and unjust enrichment. MCCC asserts counterclaims for breach of contract, estoppel and breach of duty of good faith and fair dealing. Both parties seek summary judgment on their declaratory judgment claims. In addition, MCCC seeks summary judgment on its breach of contract claim and ERC's claims for breach of contract, misrepresentation and unjust enrichment. ERC seeks summary judgment on its unjust enrichment claim and on MCCC's claims for estoppel and bad faith. ERC also seeks summary judgment on MCCC's claim for reimbursement on the Safe Tire claim.

### A. Agreement Interpretation

#### 1. Legal Standards

 The parties agree that Oklahoma law governs the interpretation of the Agreement. *See Pretrial Order* (Doc. # 62) filed January 30, 2002 at 2. Under Oklahoma law, the Court interprets an insurance contract in accordance with ordinary contract law principles. *See IDG, Inc. v. Cont'l Cas. Co.*, 275 F.3d 916, 921 n. 2 (10th Cir.2001). In doing so, the Court construes the contract according to the

---

sured. The record does not disclose the name of the other attorney or whether he or she was a member of the Blakely firm.

**20.** MCCC contends that during the relevant time period it used the Blakeley firm only for

coverage and declaratory judgment matters. ERC maintains that MCCC used the firm for a wide variety of legal issues.

**21.** Crawford ceased working for ERC on December 14, 1999.

plain meaning of its language and accepts terms within the policy according to their plain, ordinary and popular sense. The Court determines whether the agreement is ambiguous as a matter of law. *See Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861, 869 (Okla.1996). A policy term is ambiguous only if it is reasonably susceptible to more than one meaning. *See id.*

 If a policy term is ambiguous, evidence of extrinsic facts and circumstances which demonstrate the parties' intent is admissible, and construction of the contract becomes a mixed question of law and fact for the jury to determine under proper instructions. *See Fowler v. Lincoln County Conserv. Dist.*, 15 P.3d 502, 507 (Okla.2000). Industry custom and usage are relevant in interpreting an ambiguous contract. *See Oxley v. Gen. Atl. Res., Inc.*, 936 P.2d 943, 946 (Okla.1997).

### 2. Insureds' Declaratory Judgment Fees And Expenses

MCCC contends that the declaratory judgment legal fees and expenses which it was required to pay insureds are covered under paragraphs (c)(1) and (c)(2) of the Agreement. Those paragraphs provide that a "loss" includes:

> the amount paid by [MCCC] for punitive, exemplary, or compensatory damages awarded to the insured and arising out of the conduct of [MCCC] in the investigation, trial or settlement of any claim or failure to pay or delay in payment of any benefits under any policy
> . . . .

Agreement, Article VII, Exhibit 1, *ERC Exhibits.*

ERC argues that the declaratory judgment awards of attorneys' fees and expenses and fees are "litigation costs" and not compensatory damages. Various laws permit the recovery of attorneys' fees as part of litigation costs, while others desig-

nate attorneys' fees as compensatory or punitive damages. *See, e.g.,* 42 U.S.C. § 1988 (allowing reasonable attorneys' fees as part of costs); *Oates v. Oates,* 866 F.2d 203, 205–06 (6th Cir.1989) (attorneys' fees and reasonable costs recoverable as damages under 18 U.S.C. § 2520); *Synergy Gas Co. v. Sasso,* 853 F.2d 59, 66 (2d Cir.1988) (labor dispute arbitration attorneys' fees award constitutes compensatory damages); *Spicer, Watson & Carp v. Minn. Lawyers Mut. Ins. Co.,* 502 N.W.2d 400, 403–04 (Minn.Ct.App.1993) (insured may recover litigation costs and attorneys' fees as damages stemming from insurer's breach of duty to defend). The designation of attorneys' fees as "damages" or "litigation costs" may have different legal implications, such as whether the fees are recoverable against a State under the Eleventh Amendment or under an offer of judgment under Rule 68, Fed.R.Civ.P. *See, e.g., Oates,* 866 F.2d at 205 n. 3.

 Regardless of their label, an award of attorneys' fees is intended to compensate the prevailing party. In *Prudential Ins. Co. of Am. v. Carlson,* 126 F.2d 607 (10th Cir.1942), the Tenth Circuit stated:

> The fact that statutes providing for the assessment of attorneys' fees designate them as costs does not make them such, as that term is generally used and understood. Statutes providing for attorneys' fees impose a liability which one may enforce as a matter of right. Such fees are put in controversy in the suit and are part of the substantive right.

*Id.* at 611; *see also Boyd Rosene & Assoc. Inc. v. Kan. Mun. Gas Agency,* 123 F.3d 1351, 1352 (1997) (attorneys' fees in diversity suit are substantive issue controlled by state law). Webster's dictionary defines the term "compensatory damages" as "damages awarded to make good or compensate for an injury sustained." Webster's Third New International Dictionary

463 (1986). "Damages" is defined as "the estimated reparation in money for detriment or injury sustained." *Id.* at 571. Under these definitions, the Court finds that the plain and ordinary meaning of the term "compensatory damages" includes attorneys' fees and costs.

 ERC asserts that the declaratory judgment fees and expenses did not "arise out of the conduct" of MCCC within the meaning of paragraphs (c)(1) and (c)(2) because the parties intended these sections to apply only to bad faith liability. The Court need not consider the parties' intent, however, because the plain language of the policy is not ambiguous. The policy covers losses which arise out of MCCC's conduct "in the investigation, trial or settlement of any claim for failure to pay or delay in payment of any benefits under any policy." An award of an insured's fees and expenses in a declaratory judgment proceeding arises out of MCCC's conduct in failing to pay or delaying payment of benefits under the policy. Accordingly, paragraphs (c)(1) and (c)(2) of the Agreement cover declaratory judgment awards of legal fees and expenses to MCCC insureds. Questions of fact remain as to whether ERC counseled in advance with MCCC and con-curred in MCCC's course of conduct. Therefore the Court cannot determine on this record whether MCCC may recover 80 per cent of its fees and expenses under paragraph (c)(1) or 100 per cent under paragraph (c)(2).[22]

### 3. MCCC's Declaratory Judgment Fees And Expenses

 MCCC contends that the Agreement covers its declaratory judgment fees and expenses as "claim expenses." The Agreement states that "claim expenses" shall mean "all payment under the supplementary payments provisions of [MCCC's] policy, including court costs, interest upon judgments, and allocated investigation, adjustment, and legal expenses." Agreement, Article VIII. MCCC reasons that the fees and expenses which it incurred on its own behalf in declaratory judgment proceedings constitute "allocated investigation, adjustment, and legal expenses." ERC counters that the declaratory judgment fees expenses do not constitute "claim expenses" because MCCC does not pay them under the supplementary payments provision in its policy.

The supplementary payments provision in MCCC's policy provides: [23]

22. ERC argues that regardless whether the Agreement covers declaratory judgment expenses, MCCC may not recover for the Safe Tire claim because its retention under the Agreement is less than $300,000.00. MCCC submitted reinsurance billing for the Safe Tire claim in the total amount of $393,929.78: $208,500.00 for funds which MCCC paid to the claimants in the underlying action; $80,432.53 for attorneys' fees awarded to the insured in the underlying action; $53,530.00 for attorneys' fees awarded to the insured in the declaratory action; $15,000.00 for attorneys' fees awarded to the insured on appeal of the declaratory judgment action; and $36,467.25 for post-judgment interest on the attorneys' fees awarded in the declaratory judgment action. ERC contends that the $80,432.53 for attorneys' fees in the underlying action and $36,467.25 for post-judgment interest on the attorneys' fees in the declaratory judgment action constitute "claim expenses" and not "losses." ERC reasons that if MCCC had not disputed coverage, it would have paid the attorneys' fees in the underlying action under the supplementary payments provision of its policy. Even if the Court excludes $80,432.53, however, ERC's argument fails. Under the analysis set forth above, the $36,467.25 in post-judgment interest falls under the plain and ordinary meaning of "compensatory damages" under paragraphs (c)(1) and (c)(2). Thus MCCC's total loss exceeds $300,000 on the Safe Tire claim.

23. The Court considers the supplemental payments provision of MCCC's policy because the Agreement specifically refers thereto. *See* 17B C.J.S. *Contracts* § 722 (1999).

We will pay, with respect to any claim we investigate or settle or "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accident or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", [sic] including actual loss of earnings up to $100 a day because of time off from work.

e. All costs taxed against the insured in the "suit".[sic]

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in a court the part of judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

*ERC Exhibits,* Exhibit 2 at 4.

A plain reading of the supplementary payments provision indicates that it covers MCCC's declaratory judgment fees and expenses. The provision provides that MCCC will pay all expenses which it incurs with respect to any claim that it investigates. Certainly, MCCC investigated the claims for which it litigated coverage. Moreover, the fees and expenses which MCCC incurred in the declaratory judgment proceedings are expenses which it incurred with respect to such claims. Accordingly, the declaratory judgment fees and expenses fall within the plain and ordinary meaning of the supplementary payments provision.[24]

The policy language in the cases cited by ERC and MCCC differs from the Agreement here. In *British Int'l Ins. Co. v. Seguros La Republica, S.A.,* No. 90 Civ. 2370(JFK), 2001 WL 897180, at *2 (S.D.N.Y. Aug. 8, 2001), the reinsurance certificate provided that the reinsurer was "subject to the same risks ... as are or may be assumed, made or adopted by the reinsured." The Court found that the term "risk" was unambiguous and did not include the reinsured's declaratory judgment expenses. *See id.* Here, the Agreement's definition of "claim expenses" incorporates the supplementary payments provision of MCCC's policy. Neither document uses the word "risk" to define coverage.

In *Affiliated FM Ins. Co. v. Constitution Reinsurance Corp.,* 416 Mass. 839, 626 N.E.2d 878, 880 (1994), the policy provided that the reinsurer would pay "ex-

---

**24.** ERC might argue that the fees and expenses relate to suits *not* against insureds which MCCC defended and that by implication, such fees and expenses fall outside the coverage outlined in the supplemental payments provision. The plain language of the provision, however, extends coverage to (1) *any* claim which MCCC investigates or settles, or (2) any suit against an insured which MCCC defends.

penses ... incurred by the [reinsured] in the investigation and settlement of claims or suits." The policy did not define the term "expenses," and the court found that the word was ambiguous whether it included the reinsured's declaratory judgment fees and expenses. Here, the Agreement states that "claim expenses" means payments made under MCCC's supplementary payments provision. The language of the supplementary payments provision— that MCCC will pay all expenses which it incurs with respect to any claim it investigates—is more expansive than the language in the *Affiliated FM* policy—that the reinsured will pay expenses incurred in the investigation of claims. The Court is not convinced that the *Affiliated FM* holding applies in this case.

The fact that ERC used language to specifically cover declaratory judgment fees and expenses in other reinsurance agreements is irrelevant. If ERC had wanted to exclude such fees and expenses from the Agreement in this case, it could have easily done so.

### B. Remaining Claims

In light of the above rulings, MCCC's estoppel claim is moot. In addition, MCCC is entitled to summary judgment on ERC's claims for breach of contract, misrepresentation and unjust enrichment. MCCC is also entitled to summary judgment with respect to liability on its claim that ERC breached the Agreement by refusing to pay declaratory judgment fees and expenses on the Power Machinery, Safe Tire and Air Equipment claims.

 MCCC's claim for breach of duty of good faith remains. MCCC contends that by advancing conflicting positions regarding whether the Agreement covers declaratory judgment fees and expenses, ERC breached its duty to act in utmost

good faith. ERC argues that Kansas does not recognize a tort claim for bad faith. MCCC agrees, arguing that its claim is contractual in nature. *See Stonewall Ins. Co. v. Argonaut Ins. Co.*, 75 F.Supp.2d 893, 910 (N.D.Ill.1999) (duty of good faith applies to both reinsurer and reinsured). The parties dispute facts regarding whether ERC has acted in good faith. Therefore the Court will not enter summary judgment on this claim.

### C. MCCC's Remaining Motions

MCCC seeks leave to supplement its summary judgment briefing with newly discovered evidence which shows that ERC is not entitled to judgment as a matter of law on ERC's claims for declaratory judgment, breach of contract, misrepresentation or unjust enrichment. *See Supplement To Defendant Mid–Continent Casualty Company's Memorandum In Support Of Its Motion For Summary Judgment And Its Memorandum In Opposition To Plaintiff Employers Reinsurance Corporation's Motion For Summary Judgment* at 5, Exhibit A to *MCCC's Motion For Leave*. In light of the above rulings, the Court overrules as moot MCCC's motion for leave to supplement and MCCC's motion to shorten the time for ERC to respond thereto.

**IT IS THEREFORE ORDERED** that *Defendant Mid–Continent Casualty Company's Motion For Summary Judgment* (Doc. # 71) filed February 8, 2002 be and hereby is **SUSTAINED in part.** The Court grants summary judgment in favor of MCCC with respect to liability on MCCC's claims for declaratory judgment and breach of contract and on ERC's claims for breach of contract, misrepresentation and unjust enrichment. MCCC's claim for breach of duty of good faith

remains in the case. In addition, factual issues remain regarding the amounts which MCCC may recover for fees and expenses which it incurred in declaratory judgment actions with its insureds.

IT IS FURTHER ORDERED that *Plaintiff Employers Reinsurance Corporation's Motion For Summary Judgment* (Doc. # 74) filed February 8, 2002 be and hereby is **OVERRULED**.

IT IS FURTHER ORDERED that *Defendant's Motion To Strike New Material In Plaintiff's Reply Memorandum In Support Of Its Motion For Summary Judgment Or, In The Alternative, For Leave To File A Surreply* (Doc. # 91) filed April 3, 2002 be and hereby is **SUSTAINED in part and OVERRULED in part.** The Court sustains defendant's motion to file a surreply and overrules the remainder of defendant's motion.

IT IS FURTHER ORDERED that *Defendant's Motion For Leave To Supplement Summary Judgment Pleadings* (Doc. # 105) and *Defendant's Motion To Shorten Time For Plaintiff To Respond To Defendant's Motion For Leave To Supplement Summary Judgment Pleadings And Defendant's Supplement To Summary Judgment Memoranda* (Doc. # 104), both filed May 22, 2002 be and hereby are **OVERRULED as moot.**